John C. Sahradnik, Esq./Bar ID #001811976
Christopher Khatami, Esq./Bar ID #043472013
**BERRY SAHRADNIK KOTZAS & BENSON**
212 Hooper Avenue, P.O. Box 757
Toms River, NJ 08754
Telephone: (732) 349-4800/Facsimile: (732) 349-1983
Attorneys for Plaintiffs

| | |
|---|---|
| COUNTY OF OCEAN, BOARD OF CHOSEN FREEHOLDERS OF THE COUNTY OF OCEAN, | UNITED STATES DISTRICT COURT FOR THE DISTRICT OF NEW JERSEY |
| Plaintiffs, | Civil Action No. 3:19-cv-18083(FLW-TBJ) |
| v. | **MOTION RETURNABLE:** February 3, 2020 |
| STATE OF NEW JERSEY, OFFICE OF THE ATTORNEY GENERAL, DEPARTMENT OF LAW AND PUBLIC SAFETY, DIVISION OF CRIMINAL JUSTICE, AND GURBIR S. GREWAL, in his official capacity as New Jersey State Attorney General, | **PURSUANT TO L. Civ. R. 78.1(b) ORAL ARGUMENT IS REQUESTED** |
| Defendants | |

---

## PLAINTIFF COUNTY OF OCEAN'S BRIEF IN OPPOSITION TO DEFENDANTS' MOTION TO DISMISS PURSUANT TO <u>F.R.C.P.</u> 12(b)(1) &(6)

---

Christopher A. Khatami, Esq.
**Bar ID#043472013**
*On the Brief*

## TABLE OF CONTENTS

1.  Preliminary Statement. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  1-5

2.  Legal Argument

    A.  Standard of Review. . . . . . . . . . . . . . . . . . . . . . . . . . . . 6-8

    B.  Factual Background. . . . . . . . . . . . . . . . . . . . . . . . . . . . 8-10

    C.  A FAIR AND REASONABLE READING OF WILLIAMS AND TRENTON LINE OF CASES RECOGNIZES THAT MUNICIPAL GOVERNMENTS HAVE STANDING TO SUE A CREATING STATE ON SUPREMACY CLAUSE GROUNDS. . . . . . . . . . . . . . . . . . . . . . . . . . .  11-17

    D.  THE ATTORNEY GENERAL'S DIRECTIVE RESTRICTIONS ARE PREEMPTED BY FEDERAL IMMIGRATION INFORMATION SHARING STATUTES 8 U.S.C. §§ 1373 AND 1644. . . . . . . . . . . . . . . .17-25

    E.  THE ANTI-COMMANDEERING CLAUSE DOES NOT PERMIT THE STATE TO INTERFERE WITH AND FRUSTRATE FEDERAL REGULATORY OBJECTIVES. . . . . . . . . . . . . . . . . . . . . . . 25-29

    F.  STATE LAW CLAIMS. . . . . . . . . . . . . . . . . . . . . . . . . . . . 29-30

3.  Conclusion. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 31

## <u>**TABLE OF AUTHORITIES**</u>

**<u>Cases</u>:**

*Amato v. Wilentz,*
952 <u>F.2d</u> 742, 754-55 (3d Cir. 1991). . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3,15

*Arizona v. United States,*
567 U.S. 387, 394 (2012). . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3,17,18,22

*Ashcroft v. Iqbal,*
556 <u>U.S.</u> 662, 664, 675, 679 (2009). . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

*Atlantic Coast Demolition & Recycling, Inc. v.*
*Board of Chosen Freeholders of Atlantic County,*
893 <u>F.Supp.</u> 301, 314-15 (D.N.J. June 9, 1995). . . . . . . . . . . . . . . . . . . . . . . 3

*Bell Atl. Corp. v. Twombly,*
550 <u>U.S.</u> 544, 555 (2007). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7,8

*Branson School Dist. RE-82 v. Romer,*
161 F.3d 619, 628-29 (1998). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12,13

*City of New York v. U.S.,*
179 F.3d 29, 34 (1999). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4-5, 28-29

*City of Trenton v. New Jersey,*
262 U.S. 182, 43 S.Ct. 534, 67 L.Ed. 937 (1923). . . . . . . . . . . . . . . . 4,7,11,12

*Dartmouth College v. Woodward,*
17 U.S. (4 Wheat) 518, 4 L.Ed. 629 (1819). . . . . . . . . . . . . . . . . . . . . . . .14

*De Canas v. Bica,*
424 U.S. 351, 355 (1976). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

*Evancho v. Fisher,*
423 <u>F.3d</u> 347, 351 (3d Cir. 2005). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

*Florida Lime & Avocado Growers, Inc. v. Paul,*
373 U.S. 132, 142-43 (1963). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

*Garcia v. Copenhaver, Bell & Assocs.,*
104 <u>F.3d</u> 1256, 1261 (11th Cir. 1997). . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

*Gomillion v. Lightfoot*,
364 U.S. 339, 81 S.Ct. 125, 5 L.Ed.2d 110 (1960). . . . . . . . . . . . . . . .  4,11,12

*Hampton v. Mow Sun Wong*,
426 U.S. 88, 95 (1976). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

*Hines v. Davidowitz*,
312 U.S. 52, 67 (1941). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

*Hunter v. City of Pittsburgh*,
207 U.S. 161, 28 S.Ct. 40, 52 L.Ed. 151 (1907). . . . . . . . . . . . . . . . . . . 12

*Malleus v. George*,
641 F.3d 560, 563 (3d Cir. 2011). . . . . . . . . . . . . . . . . . . . . . . . . .  8

*Murphy v. NCAA*,
138 S.Ct. 1461, 200 L.Ed. 2d 854 (2018). . . . . . . . . . . . . . . . . . . . .  5,26-27

*New York v. United States*,
505 U.S. 144, 175, 176-78 (1992). . . . . . . . . . . . . . . . . . . . . . . . . . 25-27

*Ohio Nat'l Life Ins. Co. v. United States*,
922 F.2d 320, 325 (6th Cir. 1990). . . . . . . . . . . . . . . . . . . . . . . . .  6

*Oneok, Inc. v. Learjet, Inc.,*
135 S.Ct. 1591, 1595 (2015). . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

*Pennhurst State Sch. & Hosp. v. Halderman*,
465 U.S. 89, 101, 104 S.Ct. 900 79 L.Ed. 67 (1984). . . . . . . . . . . . . . . . .  15

*Printz v. United States*,
521 U.S. 898, 117 S.Ct. 2365, 2384, 138 L.Ed. 914 (1997). . . . . . . . . . . .  4,5,26

*Reno v. Condon*,
528 U.S. 141, 143-45 (2000). . . . . . . . . . . . . . . . . . . . . . . . . . . . 26

*Rice v. Santa Fe Elevator Corp.,*
331 U.S. 218, 230, 67 S.Ct. 1146, 91 L.Ed. 1447 (1947). . . . . . . . . . . . .  19,23

*Rogers v. Brockette*,
588 F.2d 1057 (5th Cir. 1979). . . . . . . . . . . . . . . . . . . . . . . . . . . 13,14

*Scheuer v. Rhoades*,
416 U.S. 232, 236 (1974). . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  8

*Steinle v. City and County of San Francisco,*
919 F.3d 1154 (9th Cir. 2019). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19,20

*Tweed-New Haven Airport Authority v. Tong,*
930 F.3d 65, 72-73 (2nd Cir. 2019). . . . . . . . . . . . . . . . . . . . . . . 4,12,13,15,17

*United States v. California,*
321 F.3d 865 (9th Cir. 2019). . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  19,20

*Valentin v. Hospital Bella Vista,*
254 F.3d 358, 363 (1st Cir. 2001). . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

*Williams v. Mayor of Baltimore,*
289 U.S. 36, 53 S. Ct. 431, 77 L.Ed. 1015 (1933). . . . . . . . . . . . . . . . 4,7, 11,12

**STATUTES, RULES & STATE REGULATIONS:**
Constitution of the United States, Article VI, Clause 2. . . . . . . . . . . . . . . . .  18

8 U.S.C. § 1373. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .1,2,3,5,19,20,21,24,28-29

8 U.S.C. § 1644. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1,2,3,5,20,21,24, 28-29

F.R.C.P. 8(a)(2). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

F.R.C.P. 12(b)(1). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6,7

F.R.C.P. 12(b)(6). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  6,7

N.J.A.C. 10A:31-6.2. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10,21

N.J.A.C. 10A:31-6.8. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10,29

N.J.S.A. 30:8-16. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

N.J.S.A. 30:8-19. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  9,29

## **PRELIMINARY STATEMENT**

The Attorney General of New Jersey's Directive No. 2018-6[1] (hereinafter the "Directive") intrudes upon and stymies the ability of local governments to abide by federal laws designed to preserve the conduit of information sharing between local governments and the federal authorities charged with enforcing our nation's federal immigration laws.

The Directive restricts "[p]roviding any non-public personally identifying information regarding any individual" and "[p]roviding access to any state, county, or local law enforcement equipment, office space, database, or property not available to the general public." Footnote reference in the Directive defines non-public personally identifying information to include, for example, social security number, driver's license number, vehicle plate number, address, telephone number, or email address. Section II of the Directive entitled *Exceptions and exclusions* makes anodyne reference in subparagraph 10 to the Directive's harmonious concert with 8 U.S.C. § 1373 and § 1644.

Section II, subparagraph 10's innocuous reference to the Directive's compliance with 8 U.S.C. § 1373 and § 1644 belies the preemption issue created by the Directive's restrictions upon the Ocean County Board of Chosen Freeholders and the Ocean County Department of Corrections that the Board oversees to refrain from sharing non-public

---

[1] On September 27, 2019, the Attorney General of New Jersey issued revised or so-called version 2 of the 2018-6 Directive. Version 2 of this Directive is substantively identical to version 1, save amendment to the provision that completely bars any local government from entering into or renewing a Section 287(g) law enforcement cooperation agreement. For the Ocean County Plaintiffs' purposes, this amendment reflected in version 2 of the Directive does not bear on Ocean County's constitutional claim in this case. Therefore, reference within this brief to the "Directive" collectively refers to both versions.

personally identifying information that would corroborate the immigration or citizenship status in accord with § 1373 and § 1644.

The plain and clear language of § 1373 preserves the conduit of information relating to citizenship or immigration status shared between federal immigration authorities and local governments. More specifically, § 1373(a) bars "a Federal, State, or local government entity or official," "[n]otwithstanding any other provision of Federal, State, or local law," from prohibiting, "or in any way restrict[ing]," "any government entity or official from sending to, or receiving from, the Immigration and Naturalization Service information regarding the citizenship or immigration status, lawful or unlawful, of any individual." See, 8 U.S.C. § 1373(a).

§ 1373(b) precludes any person or agency from prohibiting, "or in any way restrict[ing], a Federal, State, or local government entity from doing any of the following with respect to information regarding the immigration status, lawful or unlawful, of any individual: (1) Sending such information to, or requesting or receiving such information from, the Immigration and Naturalization Service; (2) Maintaining such information; (3) Exchanging such information with any other Federal, State, or local government entity." See, 8 U.S.C. § 1373(b).

In addition, the Directive's restrictions upon the Ocean County Plaintiffs' create preemption issues with 8 U.S.C. § 1644, which indicates plainly that "no State or local government entity may be prohibited, or in any way restricted, from sending to or receiving from the Immigration and Naturalization Service information regarding the immigration status, lawful or unlawful, of an alien in the United States."

8 U.S.C. § 1373 and 8 U.S.C. § 1644 preempt the Directive's restrictions upon the Ocean County Plaintiffs.   These Directive restrictions in particular restrict in the narrowest terms the type of corroborative immigration or citizenship status information, the exchange of which Congress sought to preserve by enacting § 1373 and § 1644. The Attorney General's narrow interpretation of the scope of information "regarding" immigration or citizenship status of any individual leads to the unreasonable conclusion that § 1373 and § 1644 protects from prohibition conclusory information limited to the fact of an individual's citizenship and immigration status.   Put another way, the Attorney General's reading of § 1373 and § 1644 would omit any other corroborative information such as an individual's social security number or driver's license number; two key data points to establish the immigration or citizenship status of an individual.

Further, the Attorney General attacks the Ocean County Plaintiffs' complaint for declaratory relief on two other jurisprudential grounds: a local government's standing to bring a federal constitutional claim against the creating state based upon a state statute or regulation, and the Anti-Commandeering clause of the Tenth Amendment.

Third Circuit jurisprudence has not foreclosed a local government's standing to bring challenges under federal law to state statutes that regulate the relationship between the state and the municipality.   Atlantic Coast Demolition & Recycling, Inc. v. Board of Chosen Freeholders of Atlantic County, 893 F.Supp. 301, 314-15 (D.N.J. June 9, 1995)(relying on Amato v. Wilentz, 952 F.2d 742, 754-55 (3d Cir. 1991)).   As more fully developed below, the Attorney General's misreading of the line of cases concerning a municipality's standing to sue its creating state on Supremacy Clause grounds leads to

3

the untenable conclusion that federalism necessarily precludes any and all federal constitutional challenges by a municipality against its creating state. See, e.g., Williams v. Mayor of Baltimore, 289 U.S. 36, 53 S. Ct. 431, 77 L.Ed. 1015 (1933) and City of Trenton v. New Jersey, 262 U.S. 182, 43 S.Ct. 534, 67 L.Ed. 937 (1923).  The Williams and Trenton progeny of case law does not, as the Attorney General so argues, create a per se standing rule that prohibits municipalities from challenging the creating state's statute or regulation on federal constitutional grounds.  See, e.g., Tweed-New Haven Airport Authority v. Tong, 930 F.3d 65, 72-73 (2nd Cir. 2019)(interpreting Gomillion v. Lightfoot, 364 U.S. 339, 81 S.Ct. 125, 5 L.Ed.2d 110 (1960) for the principle that Williams and Trenton line of cases did not establish a per se standing rule preventing municipalities from suing its creating state on Supremacy Clause grounds in federal court).

The Attorney General alternatively relies upon a misplaced and overbroad reading of Anti-Commandeering clause jurisprudence.  The Tenth Amendment's Anti-Commandeering clause cannot be used as a shield and a sword to frustrate federal regulatory objectives under the cover of a state's sovereign rights.  The Attorney General's reading of the Tenth Amendment's Anti-Commandeering clause conflates the critical distinction made in Printz v. United States, 521 U.S. 898, 117 S.Ct. 2365, 2384, 138 L.Ed. 914 (1997) between federal directives to states that "'require only the provision of information to the Federal Government from those that force the participation of the States' executive in the actual administration of a federal program, even though both kinds of directive leave states with no choice but to comply.'" City of

New York v. U.S., 179 F.3d 29, 34 (1999)(quoting Printz v. United States, 521 U.S. 898, 117 S.Ct. 2365, 2376, 138 L.Ed. 914 (1997)).   The United States Supreme Court's recent decision in Murphy v. NCAA, 138 S.Ct. 1461, 200 L.Ed. 2d 854 (2018) does not displace Printz's distinction between a federal requirement preventing states from disrupting or restricting the conduit of information relating to immigration or citizenship status and participation in the actual administration or enforcement of a federal program.  § 1373 and § 1644 does not require states to collect information relating to immigration or citizenship status on behalf of federal immigration authorities, or to deploy investigation resources to obtain and confirm immigration or citizenship status.  § 1373 and § 1644 simply requires that the state refrain from interfering with the sharing of such information between local government and federal immigration authorities.  Therefore, § 1373 and § 1644 do not violate the Tenth Amendment's Anti-Commandeering clause.

## LEGAL ARGUMENT

### I.     DEFENDANT'S MOTION TO DISMISS SHOULD BE DENIED

#### A. STANDARD OF REVIEW

Defendants' motion to dismiss is based upon Federal Rules of Civil Procedure 12(b)(1) for lack of standing and (b)(6) for failure to state a claim upon which relief can be granted.

### *F.R.C.P. 12(b)(1) Lack of Subject-Matter Jurisdiction*

Federal Rule of Civil Procedure 12(b)(1) challenges either the sufficiency of jurisdictionally significant facts or the accuracy of jurisdictional facts alleged by the Plaintiff. Ohio Nat'l Life Ins. Co. v. United States, 922 F.2d 320, 325 (6th Cir. 1990). In cases where a defendant challenges the sufficiency, the plaintiff's jurisdictionally significant facts are accepted as true and the court must determine whether the plaintiff has asserted an adequate basis for subject matter jurisdiction. "In performing this task, the court must credit the plaintiff's well-pleaded factual allegations (usually taken from the complaint, but sometimes augmented by an explanatory affidavit or other repository of uncontested facts), draw all reasonable inferences from them in her favor, and dispose of the challenge accordingly." Valentin v. Hospital Bella Vista, 254 F.3d 358, 363 (1st Cir. 2001). In cases where accuracy is challenged by the defendant, the court must address the merits of the jurisdictional claim by resolving the factual disputes between the parties. Garcia v. Copenhaver, Bell & Assocs., 104 F.3d 1256, 1261 (11th Cir. 1997).

In the instant matter, Defendants challenge this court's subject-matter jurisdiction based upon their misreading of Williams v. Mayor of Baltimore, 289 U.S. 36, 53 S. Ct. 431, 77 L.Ed. 1015 (1933) and City of Trenton v. New Jersey, 262 U.S. 182, 43 S.Ct. 534, 67 L.Ed. 937 (1923).   The Defendants' challenge to the Ocean County Plaintiffs' standing to sue shall be addressed fully in Part C below.

### F.R.C.P. 12(b)(6) Failure to State a Claim for Relief

When considering a motion to dismiss a complaint for failure to state a claim upon which relief can be granted pursuant to F.R.C.P., a court must accept all well-pleaded allegations in the complaint as true and view them in the light most favorable to the plaintiff. Evancho v. Fisher, 423 F.3d 347, 351 (3d Cir. 2005).   It is well-settled that a pleading is sufficient if it contains "a short and plain statement of the claim showing that the pleader is entitled to relief." F.R.C.P. 8(a)(2).

"While a complaint attacked by a Rule 12(b)(6) motion to dismiss does not need detailed factual allegations, a plaintiff's obligation to provide 'grounds' of his 'entitle[ment]' to relief' requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do...." Bell Atl. Corp. v. Twombly, 550 U.S. 544, 555 (2007).   To determine the sufficiency of a complaint, the court must take three steps in its analysis.   First, the court must "take note of the elements a plaintiff must plead to state a claim."   Second, the court should identify allegations that, "because they are no more than conclusions, are not entitled to the assumption of truth."   Third, "[w]hen there are well-pleaded factual allegations, a court should assume their veracity and then determine whether they plausibly give rise to an entitlement for

7

relief." Malleus v. George, 641 F.3d 560, 563 (3d Cir. 2011)(quoting Ashcroft v. Iqbal, 556 U.S. 662, 664, 675, 679 (2009)).

A district court, in weighing a motion to dismiss, must ask "not whether a plaintiff will ultimately prevail but whether the claimant is entitled to offer evidence to support the claim." Bell Atl. Corp. v. Twombly, 550 U.S. 544, 555 (2007)(quoting Scheuer v. Rhoades, 416 U.S. 232, 236 (1974)). A motion to dismiss should be granted if the plaintiff cannot plead enough facts to state a claim for relief that is plausible on its face. Malleus v. George, 641 F.3d 560, 563 (3d Cir. 2011)(quoting Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2007)).

### B. FACTUAL BACKGROUND

On November 29, 2018, the Attorney General of New Jersey through the Office of the Attorney General, Department of Law and Public Safety, Division of Criminal Justice issued Attorney Law Enforcement Directive No. 2018-6, also known as the "Immigrant Trust Directive." The Directive's stated policy goal was limiting the type and level of assistance and cooperation local law enforcement agencies provided to federal immigration authorities. The Directive further stated that this limitation preserved the discrete spheres of state and federal law enforcement agencies: state, county, and local law enforcement agencies are responsible for enforcing state criminal law and federal immigration authorities are responsible for enforcing federal civil immigration law.

Section IIB entitled Limitations on assisting federal immigration authorities in enforcing federal civil immigration law delineated restrictions on the type of cooperation

state, county, and local law enforcement could provide to federal immigration authorities.   Subsection 2 of the Directive restricts the provision of "any non-public personally identifying information regarding any individual."   Non-public personally identifying information includes a social security number, driver's license, vehicle plate number, address or telephone number.

Subsection 3 of the Directive prohibits providing access to any state, county, or local law enforcement equipment, office space, database, or property not available to the general public.

The Ocean County Correctional Facility (hereinafter "Ocean County Jail") is under the custody and control of the Board of Chosen Freeholders of the County of Ocean (hereinafter "the Board").   Pursuant to a Resolution of the Board, effective December 31, 1984, the Board assumed custody and control of the Ocean County Jail and all other Ocean County Jail facilities in accordance with N.J.S.A. 30:8-19.  The Ocean County Jail is operated and administered by the Ocean County Department of Corrections (hereinafter "OCDOC"), at the department head of which is Warden Sandra Mueller. (See, Mueller Certification attached hereto as Exhibit A).  The OCDOC is a separate and distinct department from the Ocean County Sherriff's Department.   (See, Mueller Certification). Unlike many other counties in New Jersey, the Ocean County Sherriff's Department does not operate or administer the Ocean County Jail.

Pursuant to N.J.S.A. 30:8-16, the OCDOC records and maintains biographical information from each inmate admitted to the Ocean County Jail; such information includes birthplace, citizenship, social security, home address, and citizenship

information.  Pursuant to N.J.A.C. 10A:31-6.2, the OCDOC must use an intake form to record the following types of biographical information: inmate's photograph, date of birth, place of birth, last known home address, social security number, and driver's license number.

N.J.A.C. 10A:31-6.8 permits the County in its discretion to decide whether and with which outside law enforcement agency inmate biographical information is shared. Prior to the Directive, in accordance with the County's discretionary authority, the OCDOC provided ICE upon its request with inmate biographical information such as name of the inmate, birthplace, citizenship status, home address, driver's license number, and social security number.  (See, Mueller Certification).

In addition, prior to the Directive, an ICE officer assigned to the Ocean County region would request access to OCDOC's Offender Management System ("OMS") to retrieve the same information directly.  (See, Mueller Certification).

Since the Directive became effective, OCDOC has not permitted any ICE official access to the OMS system to retrieve inmate biographical information. Based upon statistical data collected by the OCDOC, there is approximately 17.7 percent of foreign born inmates subject to immigration detainers upon their release from Ocean County Jail between January 1, 2017 and July 31, 2019.

**C. A FAIR AND REASONABLE READING OF <u>WILLIAMS</u> AND <u>TRENTON</u> LINE OF CASES RECOGNIZES THAT MUNICIPAL GOVERNMENTS HAVE STANDING TO SUE A CREATING STATE ON SUPREMACY CLAUSE GROUNDS**

Historically, United States Supreme Court precedent in <u>Williams v. Mayor of Baltimore</u>, 289 U.S. 36, 53 S. Ct. 431, 77 L.Ed. 1015 (1933) and <u>City of Trenton v. New Jersey</u>, 262 U.S. 182, 43 S.Ct. 534, 67 L.Ed. 937 (1923) established that political subdivisions of a state could not sue a creator state for a state statute or regulation based on constitutional rights secured by the Due Process and Equal Protection clauses of the Fourteenth Amendment or the Contracts Clause.   Justice Cardozo eloquently explained the court's rationale: "[a] municipal corporation, created by a state for the better ordering of government, has no privileges or immunities under the federal constitution which it may invoke in opposition to the will of its creator." <u>Williams v. Mayor of Baltimore</u>, 289 U.S. 36, 53 S. Ct. 431 at 40.   The bedrock constitutional principle is that permitting political subdivisions to invoke constitutional rights under the Contracts Clause or the Fourteenth Amendment would interfere with the proper functioning of state officials and instrumentalities.

Despite the broad language used by Justice Cardozo, however, the U.S. Supreme Court's decision in <u>Gomillion v. Lightfoot</u>, 364 U.S. 339, 81 S.Ct. 125, 5 L.Ed.2d 110 (1960) dispelled the interpretation that the state's plenary legislative power over its political subdivisions was invulnerable to federal constitutional challenge in federal court.   Although <u>Gomillion</u> involved plaintiff-citizens of Alabama suing the state based on state legislation redrawing voting districts in the City of Tuskegee, <u>Gomillion</u> imposed a firm limitation on the principle that the State's plenary power was not subject to

11

federal constitutional scrutiny outside the context of Due Process Clause, Equal Protection Clause, Just Compensation Clause, and Contract Clause challenges.   The Gomillion court explained that "a correct reading of the seemingly unconfined dicta of Hunter and kindred cases is not that the State has plenary power to manipulate in every conceivable way, for every conceivable purpose, the affairs of its municipal corporations, but rather that the State's authority is unrestrained by the particular prohibitions of the Constitution considered in those cases." Gomillion v. Lightfoot, 364 U.S. 339, 81 S.Ct. 125 at 344.

Gomillion shaped inchoate boundaries around the precept of state plenary authority.[2]   In view of Gomillion's limitation principle, other circuits have carefully considered the type of constitutional claims raised in Williams v. Mayor of Baltimore, 289 U.S. 36, 53 S. Ct. 431, 77 L.Ed. 1015 (1933) and City of Trenton v. New Jersey, 262 U.S. 182, 43 S.Ct. 534, 67 L.Ed. 937 (1923), and examined whether Justice Cardozo's explicated rationale for barring federal constitutional claims under the Contracts Clause and Fourteenth Amendment holds water in the light of the unique type of federalism concerns raised under the Supremacy Clause. As the Tenth, Fifth, and Second Circuits have pointed out, neither Williams nor Trenton involved Supremacy Clause challenges by a political subdivision against the creator state. See, e.g., Branson School Dist. RE-82 v. Romer, 161 F.3d 619, 628-29 (1998) and Tweed-New Haven

---

[2] The Gomillion court reasoned further that even Hunter v. City of Pittsburgh, 207 U.S. 161, 28 S.Ct. 40, 52 L.Ed. 151 (1907), a seminal case enshrining plenary state legislative power over its political subdivisions, suggested limits on a state legislature's omnipotence.  Gomillion concluded that "[t]his line of authority conclusively shows that the Court has never acknowledged that the States have power to do as they will with municipal corporations regardless of consequences.  Legislative control of municipalities, no less than other state power, lies within the scope of relevant limitations imposed by the United States Constitution." Gomillion v. Lightfoot, 364 U.S. 339, 81 S.Ct. 125 at 344.

Airport Authority v. Tong, 930 F.3d 65, 72-73 (2nd Cir. 2019).   These circuits have interpreted Williams and Trenton line of cases to stand for "only the limited proposition that a municipality may not bring a constitutional challenge against its creating state when the constitutional provision that supplies the basis for the complaint was written to protect individual rights, as opposed to collective or structural rights."   Branson School Dist. RE-82 v. Romer, 161 F.3d 619, 628-29 (1998).   The Tenth Circuit in Branson explained further that "[n]either Williams/Trenton line of cases nor any other subsequent Supreme Court case has held that a political subdivision is barred from asserting the structural protections of the Supremacy Clause of Article VI in a suit against its creating state." Id. at 629.

Similarly, the Second Circuit in Tweed explained the limitations of Justice Cardozo's state plenary power principle when confronted by Supremacy Clause challenges:

> Hundreds of federal laws apply nationwide to states and their political subdivisions.  They impose various responsibilities and prohibitions on states and political subdivisions that are intended by Congress to apply nationwide.  If the Supremacy Clause means anything, it means that a state is not free to enforce within its boundaries laws preempted by federal law.  Lawsuits invoking the Supremacy Clause are one of the main ways of ensuring that this does not occur.

> Tweed-New Haven Airport Authority v. Tong, 930 F.3d 65, 73 (2nd Cir. 2019)

Likewise, in Rogers v. Brockette, 588 F.2d 1057 (5th Cir. 1979) the Fifth Circuit explained in greater historical detail the genesis of the Hunter and Trenton line of cases barring political subdivisions from suing the creator state under Contract Clause:

> The Hunter and Trenton line of cases are descendents of Trustees of Dartmouth College v. Woodward, 17 U.S. (4 Wheat) 518, 4 L.Ed. 629 (1819).  That great case prohibited New Hampshire from modifying a charter that the colonial government had issued to Darmouth College.  Applying the contract clause to the charters and grants of a government, however, created a serious problem; many state actions might be said to be contracts with those who benefitted from them, and a state barred from impairing any such contract would be practically unable to legislate in large, important areas.
>
> Rogers v. Brockette, 588 F.2d 1057, 1068-69 (5th Cir. 1979)

The Rogers court echoed further that the Dartmouth College Court's concern centered on the Contracts Clause stultifying a state's internal organization of its political functions.  Id. at 1069.  Concern that political subdivisions' invocation of the Constitution would interfere with the internal legislative and political functioning of the state animates the subsequent holdings in Hunter, Trenton, and Williams.  As the Rogers court underscored, Gomillion has shed a different light on the old principle that the State's plenary power operates as a complete bar to a political subdivision's standing to sue on federal constitutional ground:

> But when those cases were decided, "standing" generally meant something somewhat different from what it means today.  A party had standing or a "right to sue" if it was correct in its claim on the merits that the statutory or constitutional provision in question protected its interests; standing was not seen as a preliminary or threshold question. .....In speaking of "standing," cases in the Hunter and Trenton line meant only that, on the merits, the municipality had no rights under the particular constitutional provisions it invoked.  This is why the Hunter and Trenton series of cases did not mention the criteria we now associate with inquiries into standing the extent of an actual injury and of a genuine case or controversy, for example.
>
> Rogers v. Brockette, 588 F.2d 1057, 1070 (5th Cir. 1979)

14

The Second, Fifth, and Tenth Circuits fairly and reasonably interpret the limited application of the Hunter and Trenton line of cases in light of more recent precedent in Gomillion.  The concerns that animated the U.S. Supreme Court beginning in Dartmouth College to Hunter, Williams, and Trenton are not the same federalism concerns raised by the Supremacy Clause challenge in the instant matter.  Supremacy clause challenges by political subdivisions underscore the Gomillion principle that "a state is not free to enforce within its boundaries laws preempted by federal law." Tweed-New Haven Airport Authority v. Tong, 930 F.3d 65, 73 (2nd Cir. 2019).

In Amato v. Wilentz, 952 F.2d 742, 754-55 (3d Cir. 1991), the Third Circuit accepted two key principles that shed light on Third Circuit jurisprudence on political subdivision standing to sue the creator state on federal constitutional grounds.  First, Amato accepted the premise that the Trenton and Williams line of cases are "instead holdings on the merits." Id. at 755.  Second, Amato explicitly stated "[w]hile we are not endorsing a policy of federal court abstention from all suits between state governmental actors, we also do not wade into such frays enthusiastically, and we must be certain not to adjudicate them unnecessarily." Id. at 755.

Although Amato ultimately decided that the balance of factors favored against granting third party standing to the County of Essex for the state's[3] alleged First Amendment harm to Warner Brothers, the third party standing and First Amendment concerns in Amato are not presented in this case.  Amato did not involve a first party Supremacy Clause challenge by a political subdivision of the creator state.  Third party

---

[3] New Jersey Supreme Court Chief Justice Wilentz in his official capacity is same as suing the state, see Pennhurst State Sch. & Hosp. v. Halderman, 465 U.S. 89, 101, 104 S.Ct. 900 79 L.Ed. 67 (1984).

standing presents the unique consideration of whether a third party has sufficient interests with the party allegedly harmed.  Analysis of the relationship between the first and third parties as well as the intersection of rights between the parties raises discrete issues from first party standing of a political subdivision seeking to prohibit a state from enforcing a regulation or statute that conflicts with or intrudes upon federal law. Further, Amato's jurisprudential value is that courts confronted with political subdivisions' federal constitutional challenges to state regulations or statutes must undertake a merits-based balancing test, not a per se standing rule, to determine whether the municipality's constitutional claim satisfies federalism concerns reflected in Hunter and Trenton line of cases.

The Ninth Circuit cases relied upon by the Attorney General run afoul of the Third Circuit's acceptance of this merits-based rule instead of a per se bar to standing based upon the identity of the plaintiff as a political subdivision of the creator state. Indeed, even in the Ninth Circuit has questioned whether their per se standing rule comports with a fair reading of and stated federalism concerns raised in the Hunter and Trenton line of cases, particularly in light of the Second, Fifth, and Tenth Circuits' analysis post-Gomillion.  Put simply, the controlling precedent of the Third Circuit does not adopt the per se standing rule forcefully endorsed by the Ninth Circuit cases upon which the Attorney General relies in this case.  Therefore, this court should not even consider these Ninth Circuits cases for their persuasive value, if any.

The Amato balancing approach favors granting standing to the Ocean County Plaintiffs.  The Hunter and Trenton federalism preoccupations with stultifying state

legislative functioning are not present in Ocean County's Supremacy Clause challenge to the Attorney General's Directive as applied to the Ocean County Department of Corrections.  As more fully argued in Part D below, the Ocean County Plaintiffs' Supremacy Clause challenge is rooted in ensuring that the state does not, by executive fiat, impair the proper functioning of local government's authority to comply with federal law.  Under the cloak of the Attorney General's amorphous powers as chief law enforcement officer, the state seeks "to enforce within its boundaries laws preempted by federal law." Tweed-New Haven Airport Authority v. Tong, 930 F.3d 65, 73 (2nd Cir. 2019).

Accordingly, the Ocean County Plaintiffs have standing to bring this lawsuit in federal court against the Attorney General on Supremacy Clause grounds.

### D. THE ATTORNEY GENERAL'S DIRECTIVE RESTRICTIONS ARE PREEMPTED BY FEDERAL IMMIGRATION INFORMATION SHARING STATUTES 8 U.S.C. §§ 1373 AND 1644

The federal government's authority to regulate immigration is both substantial and exclusive.  Arizona v. United States, 567 U.S. 387, 394 (2012).  "Congress and the President have broad power over immigration and naturalization which the States do not possess." Hampton v. Mow Sun Wong, 426 U.S. 88, 95 (1976).  Arizona reinforced the federal government's broad role in creating and enforcing the nation's immigration laws.  The ruling invalidated several Arizona laws designed "to discourage and deter the unlawful entry and presence of aliens and economic activity by persons unlawfully present in the United States" as preempted by federal law.  Arizona, supra, 567 U.S. at 416.

The doctrine of preemption is relevant in examining state policies related to immigration.  Preemption doctrine derives from the federal Constitution's Supremacy Clause, which states that "the Constitution, and the laws of the United States…shall be the supreme law of the land.  See, U.S. Constitution Article VI, cl. 2.  Through legislation Congress can preempt state law.  Federal preemption of state law can be express or implied.  Express preemption occurs when Congress enacts a law that explicitly expresses the legislature's intent to preempt state law. Oneok, Inc. v. Learjet, Inc., 135 S.Ct. 1591, 1595 (2015).  Alternatively, preemption may be implied when: (1) Congress intends the federal government to govern exclusively, inferred from a federal interest so dominant and federal regulation so pervasive in a particular area (field preemption); or (2) state law conflicts with federal law so that it is impossible to comply with both state and federal law, or when the state law or regulation prevents the accomplishment and execution of Congress's regulatory objectives.  Arizona v. United States, 567 U.S. 387, 399 (2012).

Although not every state enactment that deals with "aliens is a regulation of immigration and thus *per se* preempted" by the federal government's exclusive authority over immigration, the courts must examine Congress's intent in enacting the federal law.  De Canas v. Bica, 424 U.S. 351, 355 (1976)(holding that a state law regulating licenses of business employers who employ undocumented aliens was not preempted by federal law).  "In preemption analysis, courts should assume that 'the historic police powers of the States' are not superseded 'unless that was the clear and manifest purpose of Congress.'" Arizona v. United States, 567 U.S. 387, 400

(2012)(quoting Rice v. Santa Fe Elevator Corp., 331 U.S. 218, 230, 67 S.Ct. 1146, 91 L.Ed. 1447 (1947)).

The Attorney General relies chiefly upon Ninth Circuit decisions in Steinle v. City and County of San Francisco, 919 F.3d 1154 (9th Cir. 2019) and United States v. California, 321 F.3d 865 (9th Cir. 2019) for the proposition that 8 U.S.C. §§ 1373 and 1644 are strictly limited to the information of what one's immigration status is, foreclosing any and all other corroborative information that could confirm whether an individual's immigration or citizenship status.

### *8 U.S.C. § 1373*

Subsection (a) states:

> Notwithstanding any other provision of Federal, State, or local law, a Federal, State, or local government entity or official may not prohibit, or in any way restrict, any government entity or official from sending to, or receiving from, the Immigration and Naturalization Service information regarding the citizenship or immigration status, lawful or unlawful, of any individual.

Subsection (b) states:

> Notwithstanding any other provision of Federal, State, or local law, no person or agency may prohibit, or in any way restrict, a Federal, State, or local government entity from doing any of the following with respect to information regarding the immigration status, lawful or unlawful, of any individual:

> (1) Sending such information to, or requesting or receiving such information from, the Immigration and Naturalization Service.
> (2) Maintaining such information.
> (3) Exchanging such information with any other Federal, State, or local government entity.

19

Subsection (c) states:

> The Immigration and Naturalization Service shall respond to an inquiry by a Federal, State, or local government agency, seeking to verify or ascertain the citizenship or immigration status of any individual within the jurisdiction of the agency for any purpose authorized by law, by providing the requested verification or status information.

### *8 U.S.C. § 1644*

> Notwithstanding any other provision of Federal, State, or local law, no State or local government entity may be prohibited, or in any way restricted, from sending to or receiving from the Immigration and Naturalization Service information regarding the immigration status, lawful or unlawful, of an alien in the United States.

In Steinle, the Ninth Circuit considered whether §§1373 and 1644's meaning and scope of information "regarding" citizenship or immigration status properly included the release date information of an inmate held at a local jail.  The Ninth Circuit narrowly interpreted the statutory text to mean that "information regarding" "immigration status" does not encompass the state or local release date of an inmate who is an alien. Steinle, supra, 919 F.3d 1154 at 1163-64.  The court found it probative that since Congress could have but did not add the "release date" wording to the statutory text, a fair and reasonable interpretation of the statute was that it did not include release date information.  Id. at 1164.

Similarly, in United States v. California, 321 F.3d 865 (9th Cir. 2019), the Ninth Circuit narrowly interpreted §1373(a) to include information of what an alien's immigration or citizenship status is; and does not include information like release dates and addresses.  United States v. California, supra, 321 F.3d 865 at 891-92.  The court

examined the statutory construction of Title 8, finding that Congress used specific language in other provisions of Title 8 to reach "broader swaths of information"; therefore, Congress could have but did not use specific language to broaden the reach of information, and chose language that limits information to the citizenship or immigration status of a person.  Id. at 892.   In light of the narrow meaning of information required to be exchanged between federal immigration authorities and state and local governments, the Ninth Circuit concludes there is no preemption.

Neither Steinle nor California address whether closely corroborative information (e.g., social security or driver's license number) of what a person's immigration or citizenship status is falls within a proper reading of §§1373 and 1644.   Preemption analysis requires the court to determine Congress's intent in enacting the law in question.   The Ninth Circuit disregarded the legislative history of §1373 that would amplify Congress's intent in using the words "regarding information."   A fair alternative reading of §1373 is that Congress could have used the wording "information of" instead of information regarding immigration or citizenship status if it intended to strictly limit information to the person's legal classification.   In the context of the Ocean County Jail, the OCDOC collects inmate biographical information at intake of each inmate to the jail. The inmate biographical information that the OCDOC collects is specifically delineated by state regulation in N.J.A.C. 10A:31-6.2, which includes an inmate's birthplace, citizenship, social security and driver's license numbers.   The OCDOC relies upon the veracity of inmates supplying the information.   Therefore, on the intake form, an inmate may provide false information about the location of his birth, his citizenship or

immigration status, or social security number.  Hence, personally identifying non-public information such as whether the inmate's social security number is valid is closely corroborative information of the person's citizenship or immigration status.   Unlike release date information or even last known addresses, an inmate's social security or driver's license information is closely corroborative to confirming the person's citizenship or immigration status.

### *EXPRESS PREEMPTION:*

A fairer reading of the plain meaning and language of §§1373 and 1644 demonstrate that Congress intended to expressly preempt state laws or regulations that interfere with or intrude upon the conduit of immigration information sharing between federal immigration authorities and State or local governments.  The plain text of both statutes begins with "[n]otwithstanding any other provision of Federal, State, or local law,"  which reflects Congress' intent to preempt any State laws that "restrict in any way" the exchange of immigration or citizenship status information between federal and State and local governments.

### *IMPLIED PREEMPTION:*

Preemption can be implied in two circumstances.  First, "the States are precluded from regulating conduct in a field that Congress, acting within its proper authority, has determined must be regulated by its exclusive governance."  Arizona v. United States, 567 U.S. 387, 399 (2012).  Congressional intent to displace state law "can be inferred from a framework of regulation 'so pervasive...that Congress left no room for the States to supplement it' or where there is a 'federal interest...so dominant that the federal

system will be assumed to preclude enforcement of state laws on the same subject.'"

Arizona v. United States, 567 U.S. 387, 399 (2012)(quoting Rice v. Santa Fe Elevator

Corp., 331 U.S. 218, 230, 67 S.Ct. 1146, 91 L.Ed. 1447 (1947)).

Second, state laws are preempted when they conflict with federal law, which

includes cases where "'compliance with both federal and state regulations is a physical

impossibility,'" and where "the challenged state law 'stands as an obstacle to the

accomplishment and execution of the full purposes and objectives of Congress.'"

Arizona v. United States, 567 U.S. 387, 399 (2012)(quoting Florida Lime & Avocado

Growers, Inc. v. Paul, 373 U.S. 132, 142-43 (1963) and Hines v. Davidowitz, 312 U.S.

52, 67 (1941)).

### i.     *Field Preemption*

In this case, a fair reading of the legislative history of these statutes reflects

Congressional intent to regulate immigration information exchanges between federal

and state and local governments. See, H.R. Rep. No. 104-725, at 383 (1996)(Conf.

Rep.).   The provision of this type of information falls within the federal government's

purview of immigration regulation.   The Attorney General's Directive restricts the type

of information Congress sought to preserve the exchange of.  Information regarding the

citizenship or immigration status of an individual is central to Congress's regulation of

immigration in order to determine which individuals are lawfully in the United States.

Permitting the Attorney General of New Jersey to issue a Directive that restricts certain

key information that Congress sought to preserve the exchange of upends the objective

of the preemption doctrine.   If a State may enact a law or issue a regulation that

stymies the exchange of information that Congress sought to maintain because that information is vital to enforcing federal immigration laws, then at the very least the State is intruding upon the field of immigration which belongs to the federal government.

### ii.    *Conflict Preemption*

The Attorney General's Directive fails under conflict preemption principles.  First, the Directive restricts immigration or citizen status information that Congress sought to preserve the exchange of by enacting §§1373 and 1644.  Both federal statutes contain the exact same phrase: "[n]otwithstanding any other provision of Federal, State, or local law," and the same wording: "information regarding the citizenship or immigration status" of any individual.  The plain meaning and language of these statutory texts illustrate Congress's intent that information corroborative of a person's citizenship or immigration status is protected by §§1373 and 1644.  The Ninth Circuit's narrow reading of §§1373 and 1644 in Steinle and California does not displace the Ocean County Plaintiffs' argument in this regard because those cases dealt with an inmate's release date from a local jail and home address.  The Ninth Circuit did not consider whether information such as a person's social security number or driver's license number, which are closely corroborative of a person's citizenship or immigration status, fall within the scope of §§1373 and 1644.

Second, the Directive's restrictions as it pertains to sharing an inmate's social security and driver's license numbers interfere with Congress's regulation of immigration, which necessarily includes the exchange of information concerning the

citizenship or immigration status of an inmate.  In enacting Title 8, Congress sought to create a regulatory scheme to collect, share, and obtain citizenship and immigration status information, particularly to regulate the exchange of information between federal immigration authorities and the federal government.  States cannot frustrate the federal government's regulatory objectives by cloaking it in the name of State authority, or threats of any Anti-Commandeering clause violation.

Accordingly, the Attorney General's Directive is preempted by federal statutes §§1373 and 1644.

### E. THE ANTI-COMMANDEERING CLAUSE DOES NOT PERMIT THE STATE TO INTERFERE WITH AND FRUSTRATE FEDERAL REGULATORY OBJECTIVES

The Tenth Amendment to the Federal Constitution reserves those legislative powers not expressly granted to the federal government to the States.  The anti-commandeering clause of the Tenth Amendment derives from the Constitution's structural allocation of power between the federal government and the States.  The anti-commandeering clause "withholds from Congress the power to issue orders directly to the [s]tates" and prevents Congress from directly compelling the States to enact or enforce a federal regulatory program.  New York v. United States, 505 U.S. 144, 175, 176-78 (1992).  Therefore, the federal government cannot "issue directives requiring the [s]tates to address particular problems, nor command the [s]tates' officers, or those of their political subdivisions, to administer or enforce a federal regulatory program." Printz v. United States, 521 U.S. 898, 935 (1997).  In New York, the federal government passed a law that offered states a choice to adopt a federal regulatory

program regulating hazardous waste disposal or else the states would take full title to and possession of hazardous waste disposal in their state. Id. at 174-75. The New York court concluded that Congress "crossed the line distinguishing encouragement from coercion." New York v. United States, supra, 505 U.S. 144 at 174-76.

In Printz, the court held that a federal gun safety law that required local law enforcement to conduct background checks on prospective handgun purchasers violated the anti-commandeering clause because it directed the States to implement and administer a federal regulatory program. Printz v. United States, 521 U.S. 898, 926-30 (1997). The holdings of New York and Printz established that Congress cannot enact federal law that compels states to enact or enforce a federal regulatory scheme, including by conscripting the State's officers directly. Id. at 935.

Not all federal law requirements imposed on the states necessarily constitutes an anti-commandeering clause violation. In Reno v. Condon, 528 U.S. 141, 143-45 (2000), for example, the U.S. Supreme Court upheld a federal statute that barred states from disclosing or sharing a driver's personal information without the driver's consent. The court distinguished between this driver's data privacy protection law from the federal laws in New York and Printz. This driver data privacy law did not require the States in its sovereign capacity to regulate their own citizens or enact laws or regulations or require state officials to assist in the enforcement of federal statutes.

In Murphy v. NCAA, 138 U.S. 1461 (2018), the U.S. Supreme Court clarified the scope of the anti-commandeering clause by holding that the federal government violates the anti-commandeering clause not only when it coerces or compels the states

to enact or enforce a federal regulatory scheme, but also when the federal government coerces the states to refrain from acting in order to assist in enforcement of a federal law.

In this case, the Attorney General argues that if §§ 1373 and 1644 are interpreted to bar states from acting to prohibit the sharing of certain immigration related information, then those federal statutes violate the anti-commandeering clause in accordance with <u>Murphy</u>.  The common thread running throughout the court's anti-commandeering clause jurisprudence in <u>New York</u>, <u>Printz</u>, <u>Reno</u>, and <u>Murphy</u> is that the federal government cannot compel or conscript the States or its officers to enact or administer a federal regulatory program either by requiring the States act affirmatively or to refrain from acting.  Contrary to the Attorney General's position, <u>Murphy</u> did not abolish the well-established principle that any federal requirement imposed on the States necessarily violates the anti-commandeering clause.

<u>Murphy</u> elucidated two circumstances in which the anti-commandeering clause is not implicated.  First, the anti-commandeering clause does not apply when Congress evenhandedly regulates activity in which both the States and private individuals engage. <u>Murphy v. NCAA,</u> 138 U.S. 1461, 1478-79 (2018).  Second, the anti-commandeering clause does not apply when the federal government enacts a regulatory scheme involving "cooperative federalism," in which states are given a choice either to implement, on its own, a federal regulatory program, or opt-out and yield to the federal government's administration of that program.   <u>Murphy v. NCAA,</u> 138 U.S. 1461, 1479 (2018).

Murphy did not require that both of these categories be satisfied as a multi-factor test.   Murphy outlined these situations as categories in which the anti-commandeering clause hitherto has not been implicated.  Murphy also did not overturn the critical distinction drawn in Printz between federal directives to states that "'require only the provision of information to the Federal Government" from those that "force [the] participation of the States' executive in the actual administration of a federal program."' City of New York v. U.S., 179 F.3d 29, 35 (2d Cir. 1999).  In City of New York, the Mayor of New York challenged provisions of the federal Immigration Reform Act that prohibited State and local governments from restricting any other government entity or official from exchanging information with the INS about the immigration or citizenship status of any individual.  Id. at 32.  Prior to and including the period of this federal law, three consecutive Mayors of the City of New York signed Executive Orders prohibiting city officers or employees from sharing information relating to a person's immigration or citizenship status with the INS.

In the wake of Congress's enactment of this federal law, the City argued that these information sharing provisions violated the anti-commandeering clause because it imposed a requirement on the States to refrain from restricting the exchange of such information, and in so doing coerced the States to assist in the enforcement of federal immigration law and interfered with the State's control over its own workforce.  The City of New York court concluded that these federal law provisions, which are nearly identical to §§1373 and 1644 "do not directly compel states or localities to require or to prohibit anything.  Rather, they prohibit state and local governmental entities or officials

only from directly restricting the voluntary exchange of immigration information with the INS." City of New York v. U.S., supra, 179 F.3d 29 at 35.  Crucially, the court stated further that the City could not use the anti-commandeering clause as a "shield against the federal government's using state and local governments to enact and administer federal programs [,and] into a sword allowing states and localities to engage in passive resistance that frustrates federal programs." Id. at 35.

In the instant case, §§1373 and 1644 simply require that State and local governments refrain from enacting statutes or regulations that impede or restrict the conduit of information related to the citizenship or immigration status of an individual. The federal government's regulatory objective in enforcing federal immigration laws cannot be stymied by State bans insulated within the anti-commandeering clause of the Tenth Amendment.

Accordingly, §§1373 and 1644 does not violate the anti-commandeering clause.

### F.  STATE LAW CLAIMS

The Ocean County Plaintiffs' state law claim is based on the legal principle that the Attorney General of New Jersey lacks the constitutional, statutory, or common law power to direct Ocean County to withhold sharing inmate biographical information the OCDOC is required to collect and maintain from each inmate, and which the County has discretionary authority to share with outside law enforcement agencies pursuant to N.J.A.C. 10A:31-6.8.  The Board of Chosen Freeholders for the County of Ocean assumed custody and control of the Ocean County Jail pursuant to well-established statutory authority conferred by the New Jersey Legislature.  See, N.J.S.A. 30:8-19. The

Attorney General's statutory law enforcement powers do not control the administrative function of OCDOC sharing inmate biographical information with outside law enforcement agencies that request information made available in the County's discretionary authority.

## **CONCLUSION**

For the reasons set forth herein, it is respectfully submitted that Defendants' motion to dismiss pursuant to F.R.C.P. 12(b)(1)&(6) for lack of subject-matter jurisdiction and failure to state a claim for relief must be denied.  **The Ocean County Plaintiffs request oral argument pursuant to L. Civ. R. 78.1(b).**

                            **BERRY, SAHRADNIK, KOTZAS & BENSON**

                            **s/ *CHRISTOPHER A. KHATAMI***

Dated: January 21, 2020

31