## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

| | |
|---|---|
| COUNTY OF OCEAN, BOARD OF CHOSEN FREEHOLDERS OF THE COUNTY OF OCEAN, <br><br>     Plaintiffs, <br><br>    v. <br><br> GURBIR S. GREWAL, in his official capacity as Attorney General of the State of New Jersey, AND OFFICE OF THE ATTORNEY GENERAL OF THE STATE OF NEW JERSEY, DEPARTMENT OF LAW AND PUBLIC SAFETY, DIVISION OF CRIMINAL JUSTICE, <br><br>     Defendants, <br><br> and <br><br> ROBERT A. NOLAN, in his official capacity as Cape May County Sheriff, and COUNTY OF CAPE MAY, <br><br>     Plaintiffs, <br><br>    v. <br><br> GURBIR S. GREWAL, in his official capacity as Attorney General of the State of New Jersey, and OFFICE OF THE STATE OF NEW JERSEY, DEPARTMENT OF LAW, AND PUBLIC SAFETY, DIVISION OF CRIMINAL JUSTICE, <br><br>     Defendants. | Hon. Freda L. Wolfson, U.S.D.J. <br> Hon. Tonianne J. Bongiovanni, U.S.M.J. <br><br> CONSOLIDATED CIVIL ACTION NO. 3:19-CV-18083-FLW-TJB <br><br><br> <u>**CIVIL ACTION**</u> <br><br> **(ELECTRONICALLY FILED)** <br><br> Motion Return Date: February 3, 2020 |

## DEFENDANTS' BRIEF IN OPPOSITION TO PLAINTIFFS' MOTION FOR A PRELIMINARY INJUNCTION

Jeremy Feigenbaum
Daniel M. Vannella
Michael C. Walters
Assistant Attorneys General
    Of Counsel and on the Brief


Bryan Edward Lucas
Michael R. Sarno
Marie Soueid
Emily K. Wanger
Deputy Attorneys General
    On the Brief

GURBIR S. GREWAL
ATTORNEY GENERAL OF NEW
JERSEY
R.J. Hughes Justice Complex
25 Market Street
P.O. Box 116
Trenton, New Jersey 08625
*Attorney for Defendants, Gurbir S. Grewal and the New Jersey Office of the Attorney General, Department of Law and Public Safety, Division of Criminal Justice*

# **TABLE OF CONTENTS**

**Page**

PRELIMINARY STATEMENT ...............................................................1

STATEMENT OF FACTS AND PROCEDURAL HISTORY ................................3

STANDARD FOR PRELIMINARY INJUNCTION.................................................3

ARGUMENT ...........................................................................5

    I.    PLAINTIFFS WILL NOT SUCCEED ON THE MERITS ................................................................................5

    II.    PLAINTIFFS HAVE NOT ESTABLISHED THAT THEY WILL SUFFER IRREPARABLE HARM ..............................5

    III.    THE BALANCE OF EQUITIES AND THE PUBLIC INTEREST FAVOR DENYING RELIEF.........................................14

CONCLUSION ...................................................................19

i

## <u>TABLE OF AUTHORITIES</u>

<u>Cases</u>                                                                                    <u>Page</u>

*Acierno v. New Castle Cty.*,
   40 F.3d 645 (3d Cir. 1994) ..........................................................................4, 6, 8

*Adams v. Freedom Forge Corp.*,
   204 F.3d 475 (3d Cir. 2000) ............................................................................3, 9

*Am. Beverage Corp. v. Diageo N. Am., Inc.*,
   936 F.Supp.2d 555 (W.D. Pa. 2013)....................................................................6

*Becerra v. Sessions*,
   No. 17-cv-04701, Dkt. 116-4 (N.D. Cal. Sept. 5, 2018) ....................................12

*City & Cty. of San Francisco v. Sessions*,
   349 F.Supp.3d 924 (N.D. Cal. 2018)..................................................................15

*Doris Behr 2012 Irrevocable Trust v. Johnson & Johnson*,
   No. 19-8828, 2019 WL 1519026 (D.N.J. 2019)...............................................6, 8

*GoNannies, Inc. v. GoAuPair.com, Inc.*,
   464 F.Supp.2d 603 (N.D. Tex. 2006) ..............................................................6, 8

*Janus v. Am. Fed. of State, Cty., and Mun. Emps., Council 31*,
   138 S. Ct. 2448 (2018)........................................................................................10

*Kos Pharms. Inc. v. Andrx Corp.*,
   369 F.3d 700 (3d Cir. 2004) ............................................................................3, 4

*Liberty Lincoln-Mercury, Inc. v. Ford Motor Co.*,
   562 F.3d 553 (3d Cir. 2009) ..................................................................................9

*Macchione v. Coordinator Adm'r in Wash., D.C.*,
   591 F. App'x 48 (3d Cir. 2014) ...........................................................................9

*Maryland v. King*,
   567 U.S. 1301 (2012) (Roberts, C.J. in chambers)............................................14

*N.J. Hosp. Ass'n v. Waldman*,
   73 F.3d 509 (3d Cir. 1995) ...................................................................................4

*Opticians Ass'n of Am. v. Indep. Opticians of Am.*,
  920 F.2d 187 (3d Cir. 1990) ................................................................4

*Otsuka Pharma. Co. v. Torrent Pharma. Ltd.*,
  99 F.Supp.3d 461 (D.N.J. 2015) ..........................................................6

*P.C. Yonkers, Inc. v. Celebrations the Party & Seasonal Superstore, LLC*,
  428 F.3d 504 (3d Cir. 2005) .................................................................3

*Pharmacia Corp. v. Alcon Labs.*,
  201 F.Supp.2d 335 (D.N.J. 2002) ......................................................6, 8

*Reilly v. City of Harrisburg*,
  858 F.3d 173 (3d Cir. 2017) .................................................................4

*S. Lake Tahoe v. Cal. Tahoe Reg'l Planning Agency*,
  625 F.2d 231 (9th Cir. 1980) ..............................................................10

*Sierra Club v. U.S. Army Corps of Eng'rs*,
  No. 05-1724, 2005 WL 2090028 (D.N.J. 2005)....................................8

*Smith v. Obama*,
  217 F. Supp. 3d 283 (D.D.C. 2016)....................................................10

*Truck Ctr., Inc. v. Gen'l Motors Corp.*,
  847 F.2d 100 (3d Cir. 1998) .................................................................3

## PRELIMINARY STATEMENT

Thirteen months after Attorney General Gurbir S. Grewal issued new rules to govern state and local law enforcement officers' participation in federal immigration operations, and three months after Attorney General Grewal announced updates to those statewide rules, Cape May County and some of its elected officials filed this motion to preliminarily enjoin the Immigrant Trust Directive from staying in effect while they challenge its validity. Plaintiffs did so unusually late in the lawsuit—two months after they filed their action challenging the Immigrant Trust Directive, and one day before Defendants were scheduled to file a motion to dismiss their complaint (*see* ECF No. 9-1 at 7). And Plaintiffs' motion is no small request: while they gloss over this fact, every state, county, and local law enforcement agency across the state has been complying with the Directive for almost a year, and with the limited updates for four months. Plaintiffs thus have a high bar to clear if they are to demonstrate the need for a judicially-mandated disruption of the statewide status quo.

Plaintiffs cannot satisfy that burden for either or both of two reasons. First, as explained in New Jersey's motion to dismiss, ECF No. 14-1, these federal and state law causes of action fail on jurisdictional grounds and on the merits. New Jersey's brief describes the history and application of the Immigrant Trust Directive, and it goes on to explain why black letter principles of standing, sovereign immunity, and federal preemption require dismissal of Plaintiffs' claims. Rather than reiterate the

background and arguments, the State incorporates that brief by reference. Because Plaintiffs' claims all warrant dismissal, *a fortiori* Plaintiffs cannot establish that they have a likelihood of success sufficient for a preliminary injunction.

Second, this Court need not even consider the merits of Plaintiffs' arguments in order to deny this motion because the remaining factors for granting preliminary relief all cut strongly against any such award. A preliminary injunction is typically appropriate in order to prevent imminent harm from happening to the plaintiff while a lawsuit progresses—in other words, to preserve the status quo because, by the end of the case, it would be too late to undo the damage the defendant has done. But the opposite is true in this case: *Plaintiffs*, not the Attorney General, are hoping to upend the status quo. After all, the Immigrant Trust Directive took effect over ten months ago (and was issued over three months before that), and New Jersey's state, county, and local law enforcement agencies have uniformly been in compliance since then. To make matters worse, Plaintiffs' attempts to upend settled practice also threaten the public interest because they threaten public safety—the injunction they seek risks irretrievably damaging the trust between New Jersey's law enforcement officers and the immigrant communities they serve, which is critical for ensuring that victims and witnesses come forward to report crimes regardless of their immigration status. This Court should thus reject the preliminary injunction that Plaintiffs now demand.

## STATEMENT OF FACTS AND PROCEDURAL HISTORY

For this Court's convenience, Defendants adopt by reference the Statement of Facts and Procedural History from their Motion to Dismiss brief (ECF No. 14-1 at 4-14). For the same reason, Defendants respectfully suggest that the Court review that brief—which contains the background and the arguments on the merits—before reviewing this one. (Indeed, if this Court agrees that this case should be dismissed, then it can deny this preliminary injunction motion as moot.)

## STANDARD FOR PRELIMINARY INJUNCTION

"[T]he grant of injunctive relief," courts have explained, "is an extraordinary remedy which should be granted only in limited circumstances." *Truck Ctr., Inc. v. Gen'l Motors Corp.*, 847 F.2d 100, 102 (3d Cir. 1998); *see also, e.g., Adams v. Freedom Forge Corp.*, 204 F.3d 475, 487 (3d Cir. 2000) (adding that the "dramatic and drastic power of injunctive force may be unleashed only against conditions generating a presently existing actual threat" (citation omitted)). To qualify for such preliminary injunctive relief, the moving party must demonstrate:

> (1) A likelihood of success on the merits; (2) that it will suffer irreparable harm if the injunction is denied; (3) that granting preliminary relief will not result in even greater harm to the nonmoving party; and (4) that the public interest favors such relief.

*Kos Pharms. Inc. v. Andrx Corp.*, 369 F.3d 700, 708 (3d Cir. 2004). The burden to prove each element rests on the plaintiff. *P.C. Yonkers, Inc. v. Celebrations the Party*

*& Seasonal Superstore, LLC*, 428 F.3d 504, 508 (3d Cir. 2005). And this is no small burden: the plaintiff must produce "evidence sufficient to convince the district court that all four factors favor preliminary relief." *N.J. Hosp. Ass'n v. Waldman*, 73 F.3d 509, 512 (3d Cir. 1995) (citations omitted).

In considering these four factors, courts have explained that the first two—the likelihood of success and irreparable harm—are "gateway factors" that the plaintiffs must satisfy in order to obtain preliminary relief. *Kos Pharms*, 369 F.3d at 708; *see also, e.g., Reilly v. City of Harrisburg*, 858 F.3d 173, 179 (3d Cir. 2017). And even if a plaintiff satisfies those first two tests, a court must still "consider[] the remaining two factors"—the balance of the equities and the public interest—"and determine[] in its sound discretion if all four factors, taken together, balance in favor of granting the requested preliminary relief." *Kos Pharms*, 369 F.3d at 708. Finally, this Court must undertake this entire four-prong analysis with an eye toward maintaining the status quo—*i.e.,* "the last, peaceable, noncontested status of the parties." *Opticians Ass'n of Am. v. Indep. Opticians of Am.*, 920 F.2d 187, 197 (3d Cir. 1990); *see also, e.g., Acierno v. New Castle Cty.*, 40 F.3d 645, 647 (3d Cir. 1994) (noting that "[a] primary purpose of a preliminary injunction is maintenance of the status quo until a decision on the merits of a case is rendered").

## ARGUMENT

### I.   PLAINTIFFS WILL NOT SUCCEED ON THE MERITS.

Plaintiffs' failure to demonstrate a likelihood of success on the merits suffices to require denial of their application for a preliminary injunction. Underscoring the questionable nature of Plaintiffs' late-filed request for injunctive relief, New Jersey has already filed its motion to dismiss Plaintiffs' complaint. The brief in support of that motion explains why Plaintiffs' federal and state claims all warrant dismissal; *a fortiori*, Plaintiffs cannot show a likelihood of success sufficient for a preliminary injunction. In short, Plaintiffs' federal law claims will not succeed because counties cannot sue their states for alleged violations of federal constitutional law in federal court, and because the Immigrant Trust Directive is plainly not preempted by federal law. Plaintiffs' state law claims are equally unlikely to succeed because New Jersey has not waived its sovereign immunity with regard to these claims. Because those issues prove fatal to Plaintiffs' case, they also dispose of this motion.[1]

### II.   PLAINTIFFS HAVE NOT ESTABLISHED THAT THEY WILL SUFFER IRREPARABLE HARM.

Plaintiffs' motion also fails because they cannot show irreparable harm from ongoing compliance with the Immigrant Trust Directive while they litigate this case.

---

[1] Insofar as Plaintiffs introduce any new arguments in their motion for a preliminary injunction, Plaintiffs are likely to raise those same arguments in their opposition to New Jersey's motion to dismiss—filed on the same day as this brief—and the State will address them in its reply.

That is so for two independent reasons: Plaintiffs' delay in seeking such preliminary relief, and the inadequacy of their showing of injury.

As a threshold matter, the timing of Plaintiffs' efforts to upend the status quo belies their contention that they are suffering from irreparable harm. It is black letter law that "Plaintiffs' delay in filing" their motion for preliminary relief "undermines any arguments of immediate irreparable harm." *Doris Behr 2012 Irrevocable Trust v. Johnson & Johnson*, No. 19-8828, 2019 WL 1519026, *4 (D.N.J. 2019); *see also, e.g., Otsuka Pharma. Co. v. Torrent Pharma. Ltd.*, 99 F.Supp.3d 461, 503 (D.N.J. 2015) (describing delay as "an important factor bearing on the need for a preliminary injunction, particularly irreparable harm"); *Pharmacia Corp. v. Alcon Labs.,* 201 F.Supp.2d 335, 382 (D.N.J. 2002) (noting that a delay can "knock[] the bottom out of any claim of immediate and irreparable harm," and that it is a "dispositive basis" for rejecting a preliminary injunction); *Am. Beverage Corp. v. Diageo N. Am., Inc.*, 936 F.Supp.2d 555, 610-12 (W.D. Pa. 2013) (collecting cases). It is no surprise that courts look so skeptically on such motions—delays show "that there is no apparent urgency to the request for injunctive relief" and thus no need for courts to step in on a preliminary basis, *GoNannies, Inc. v. GoAuPair.com, Inc.*, 464 F.Supp.2d 603, 609 (N.D. Tex. 2006) (citation omitted), and delays increase the risk that the preliminary injunction would "fundamentally alter[] the status quo," *Acierno*, 40 F.3d at 647.

That proves fatal to Plaintiffs' request. Two kinds of delays can undermine a claim of irreparable harm—delays before the filing of a lawsuit, and delays between the complaint and the request for preliminary relief—and both are present here. Most obviously, Attorney General Grewal first announced the Immigrant Trust Directive on November 29, 2018, and its requirements took effect on March 15, 2019. That Directive contained three of the four legal obligations that Plaintiffs attack in their motion for a preliminary injunction—namely, the limits on "(1) providing any non-public personally identifying information [to immigration authorities], (2) providing notice of a detained individual's upcoming release from custody, [and] (3) detaining an individual beyond 11:59pm of his or her release date." Plaintiffs' Memo. of Law in Support of Pltfs.' Mot. for a Prelim. Injunction (PI Br.), ECF No. 13-1 at 12-13. The State thus issued these requirements *10.5 months* before Plaintiffs requested any preliminary relief. Plaintiffs offer no reason for that delay, and none is apparent.

Delays also infect Plaintiffs' claims regarding the Immigrant Trust Directive's prohibition on "voluntarily entering into 287(g) Agreements." *Id.* at 13. While this last requirement was issued on September 27, 2019, that is still two and a half months before Plaintiffs pursued preliminary relief. (And by the time of this filing, each law enforcement agency has been in compliance for almost four months.) It is especially hard to understand the lag between issuance of the revised Directive and Plaintiffs' request for preliminary relief because Attorney General Grewal gave Sheriff Nolan

a week to terminate his 287(g) agreement—during which time Plaintiffs could have pursued this relief. Instead, it took them over 11 weeks to do so. That delay is all the more striking because Plaintiffs filed their suit on October 15, 2019, but provide no reason why they waited another *two months* before seeking preliminary relief.

Delays far shorter than the ones described above have proven fatal to other requests for preliminary relief. *See, e.g., Doris Behr 2012,* 2019 WL 1519026 at *4 (six weeks); *Sierra Club v. U.S. Army Corps of Eng'rs*, No. 05-1724, 2005 WL 2090028, *18 (D.N.J. 2005) (five weeks between filing of complaint and motion for preliminary relief); *see also Pharmacia Corp.*, 201 F. Supp. 2d at 383-84 & 384 n.18 (collecting cases ranging from twelve weeks to ten months). In other words, as these decisions show, such delays are more than enough time to demonstrate that there is no real urgency to the request, and that there is an intolerably high risk a preliminary injunction will upend the status quo. *See Acierno*, 40 F.3d at 647; *GoNannies*, 464 F.Supp.2d at 609. The same result is proper here. Law enforcement officers across the state have been complying with the Immigrant Trust Directive for nearly a year, and there is no reason to upset that settled practice.

Separate and apart from the timing, Plaintiffs' brief fails to advance the sorts of injuries necessary to establish irreparable harm. The Third Circuit has "repeatedly insisted" that courts should not award preliminary relief "unless the moving party shows that it specifically and personally risks" harm while the case remains pending.

*Liberty Lincoln-Mercury, Inc. v. Ford Motor Co.*, 562 F.3d 553, 557 (3d Cir. 2009) (citing *Adams*, 204 F.3d at 487). That harm, of course, "must be actual and imminent, not merely speculative," *Macchione v. Coordinator Adm'r in Wash., D.C.*, 591 F. App'x 48, 49 (3d Cir. 2014), and must be based on facts "at a hearing, or … through affidavits, deposition testimony, or other documents, about the particular situations of the moving parties." *Adams*, 204 F.3d at 487. Plaintiffs assert three harms: that (1) a constitutional violation is *ipso facto* an irreparable injury; (2) Sheriff Nolan "is being forced to choose between violating his oath of office [to uphold federal law] by abiding by the Directive or refusing to comply with a directive imposed by the [state] Attorney General"; and (3) the Immigrant Trust Directive "puts the safety of Cape May County's residents and visitors at risk by eviscerating [its sheriff's] ability to communicate, cooperate and share information" with immigration authorities. PI Br. at 20-22. None of those harms meet the legal requirements.

Plaintiffs' first two asserted irreparable harms fail for similar reasons. As the State explained in its motion to dismiss—which, as noted above, is incorporated here by reference—the Directive does not violate federal law, and therefore there can be no irreparable harm. *See* ECF No. 14-1 at 21-38. But even if the Immigration and Nationality Act does somehow preempt the Directive without running afoul of the Tenth Amendment, the Sherriff's claim that the Directive requires him to violate his oath of office still comes up short. After all, everyone agrees that Sheriff Nolan

himself is free to decline to participate in the 287(g) program or decline to share information with immigration authorities; that is a key tenet of Tenth Amendment jurisprudence. The only question is whether New Jersey's chief law enforcement officer can instruct him to decline. Simply put, even if the Directive is preempted (and it is not), the Sheriff himself is not violating federal law.[2] In any event, a number of courts have held that violations of an oath of office are not even sufficient to establish an official's standing, let alone to show any irreparable harm. *See, e.g.*, *S. Lake Tahoe v. Cal. Tahoe Reg'l Planning Agency*, 625 F.2d 231, 237 (9th Cir. 1980) (holding that "councilmembers' desire not to violate their oaths of office does not confer standing"); *Smith v. Obama*, 217 F. Supp. 3d, 283, 291 (D.D.C. 2016) (same for military officers). All the more so here, where Plaintiffs fail to provide any detail—including in Sheriff Nolan's own declaration—regarding how the Sheriff would be violating his oath.

---

[2] Plaintiffs are relying on a logical fallacy. Plaintiffs reason that Sheriff Nolan cannot follow the Immigrant Trust Directive without violating his oath of office because his oath requires the Sheriff to "support and uphold the United States Constitution" and he "believes the Directive to be unconstitutional." PI Br. 22. Although superficially appealing, this argument is not sound: a law can be unconstitutional, but it can still be constitutional for someone to follow it. Take, for example, laws requiring public employees to pay union dues. While the Supreme Court held that such state laws are unconstitutional, *see Janus v. Am. Fed. of State, Cty., and Mun. Emps., Council 31*, 138 S. Ct. 2448 (2018), it is still perfectly constitutional for an employee herself to pay union dues. So too here: Sheriff Nolan would be within his rights under federal law to decline to participate in the 287(g) program.

Plaintiffs' final claim—that irreparable damage to public safety results from continued compliance with the Immigrant Trust Directive—fares no better. Plaintiffs contend that the Directive's limits on information sharing with federal immigration authorities and prohibition on 287(g) agreements will put county residents or visitors at risk because it allows violent and undocumented inmates to return to the streets. *See* PI Br. 27; *see also id.* (baldly asserting that, under the Directive, "criminals will be released into Cape May County to commit other crimes"). Plaintiffs are mistaken. As Attorney General Grewal noted in a letter accompanying his September revisions to the Immigrant Trust Directive, the Directive "authorize[s] law enforcement (*i.e.,* correctional authorities) to notify [ICE] about individuals in their custody who have been charged with or convicted of a range of violent or serious offenses—such as murder and sexual assault—and to transfer custody of such individuals to ICE when federal agents pick them up as described in the Directive." ECF No. 14-6 at 1; *see also* Declaration of Mercer County Prosecutor Angelo J. Onofri (Onofri Decl.) ¶ 8 (same). The Directive authorizes law enforcement to notify ICE of the release date of *any* inmate who "in the past five years, has been convicted of an indictable crime." ECF No. 14-5 at 5. The Directive also states that law enforcement may notify ICE of the release date for anyone who was charged with or has ever been convicted of a range of significant offenses—including *any* first- or second-degree crime, domestic violence assault, or other enumerated violent or serious crime. *Id*.

11

The truth is, available evidence disproves any claim that the Immigrant Trust Directive undermines public safety. As of March 2019, every state, county, and local law enforcement agency was complying with the Directive's rules on information sharing with ICE. As New Jersey's officers attest—including police chiefs and county prosecutors—the Directive has enhanced public safety, rather than undermined it. *See, e.g.,* Declaration of Bridgeton Police Chief Michael A. Gaimari, Sr. (Gaimari Decl.) ¶ 11; Onofri Decl. ¶ 7. Further, even before the Directive, only 3 out of 550 law enforcement agencies in New Jersey maintained voluntary 287(g) agreements with ICE, and fewer than 90 law enforcement agencies in the entire country have them today. *See* USCIS, "Delegation of Immigration Authority Section 287(g) Immigration and Nationality Act," *available at* https://www.ice.gov/287g. Plaintiffs offer no evidence that any of these other jurisdictions (especially the other counties in New Jersey) are any less safe, and in fact, the available evidence from other states confirms that policies like the Immigrant Trust Directive enhance public safety. *See, e.g., Becerra v. Sessions*, No. 17-cv-04701, Dkt. 116-4 at 13-14 (N.D. Cal. Sept. 5, 2018) (Declaration of Tom Wong) (Ex. A) (reviewing academic studies and finding "no clear evidence to suggest that … crime is lower when local law enforcement officials are doing the work of federal immigration enforcement").[3] In

---

[3] This is confirmed by multiple other national studies, including ones involving state policies with even stricter limits on state and local law enforcement cooperation with ICE than the Immigrant Trust Directive. *See* Part III, *infra* (collecting studies).

other words, Plaintiffs' speculative assertions about the harms to public safety have no basis in fact or in evidence presented to this Court.

Plaintiffs' public safety claims are especially overblown given the history of their own prior 287(g) agreement. Although it is true that Sheriff Nolan turned over some criminals to ICE pursuant to that agreement, "most offenders who have been turned over to ICE in New Jersey pursuant to a 287(g) agreement—and, indeed, *all* of the most serious offenders—could have been referred to ICE under the plain terms of the Directive" described above. ECF No. 14-6 at 3. Nor is that specific to Cape May County; despite Plaintiffs' suggestion to the contrary, county jails continue to share information with ICE regarding dangerous and serious offenders, as outlined in the Directive. There is thus "no reason that New Jersey law enforcement agencies would ever have to release an individual who committed a violent or serious offense back into the community rather than into federal custody." ECF No. 14-6 at 1. It is incumbent on Plaintiffs to show otherwise, a burden they have not even tried to meet.

Absent any real injury, and given the long delays in this case, this Court should dismiss Plaintiffs' motion for preliminary relief for lack of irreparable harm.

### III.   THE BALANCE OF EQUITIES AND THE PUBLIC INTEREST FAVOR DENYING RELIEF.

Even if this Court concludes that Plaintiffs have a sufficiently high likelihood of success and are experiencing irreparable harm, the remaining factors strongly cut in favor of maintaining the status quo and thus denying the requested relief. In stark contrast to Plaintiffs' inability to demonstrate irreparable harm, the State would be significantly and irreparably impacted by an injunction preventing it from continuing to enforce the Immigrant Trust Directive during this lawsuit. As a general matter, of course, a State suffers such a harm anytime it is enjoined by the court from enforcing one of its enacted policies. *Maryland v. King*, 567 U.S. 1301, 1301 (2012) (Roberts, C.J. in chambers). But here, the "ongoing and concrete harm to [New Jersey's] law enforcement and public safety interests" of an injunction would be particularly acute, *id.*, and so the public interest considerations are even more powerful than usual.

At bottom, the Immigrant Trust Directive promotes public safety, and so any injunction that prevents it from remaining in effect undermines safety. The Directive starts from a basic premise: "[i]t is well-established … that individuals are less likely to report a crime if they fear that the responding officer will turn them over to immigration authorities." ECF No. 14-5 at 1. That is not speculative; a significant body of academic research and law enforcement reporting confirms that fears of ICE referrals lead immigrants to avoid interacting with law enforcement even when have been the victims of or witnesses to a crime. *See, e.g.*, Onofri Decl. ¶ 9 (confirming

14

"individuals are less likely to report information concerning a crime if they fear that the responding officer will turn them over to immigration authorities."); Testimony of Tom Manger, Police Chief, Montgomery Cty., Md., and President, Major Cities Chiefs Ass'n (July 21, 2015) (Ex. B) ("Cooperation is not forthcoming from persons who see their police as immigration agents."); Wong, *supra*, at 13-14 (Ex. A) (noting "research that shows that undocumented women who are victims of violent crimes and undocumented women who are victims of sexual assault or domestic violence are less likely to report crimes if law enforcement officials are also doing the work of federal immigration enforcement").[4]

---

[4] Other studies and news articles have repeatedly described the same trend. *See, e.g., City & Cty. of San Francisco v. Sessions*, 349 F.Supp.3d 924, 951 (N.D. Cal. 2018) (noting that, in "one study, the fear of police inquiring into immigration status results in a lower likelihood that Latinos will report being a victim or witnessing crimes by 44 percent, undocumented immigrants by 70 percent, and even U.S.-born Latinos by 28 percent") (citing, *e.g.,* Nik Theodore, *Insecure Communities: Latino Perceptions of Police Involvement in Immigration Enforcement* 6 (2013) (Ex. E)); Wong, *supra*, at 13 (Ex. A) (finding that if "local law enforcement officials 'were working together with ICE' to do the work of federal immigration enforcement, 60.8 percent of undocumented immigrants are *less likely* to report a crime they witnessed to police ($p < .001$) and 42.9 percent are *less likely* to report being a victim of a crime to police ($p < .001$)"); Jennifer Medina, *Too Scared to Report Sexual Abuse. The Fear: Deportation*, N.Y. Times, Apr. 30, 2017 (Ex. F) ("Law enforcement officials in several large cities, including Los Angeles, Houston and Denver, say the most dangerous fallout of changes in policy and of harsh statements on immigration is that fewer immigrants are willing to go to the police."). The State has included even more studies, law enforcement accounts, and articles at Exhibits G-R.

That fear has devastating consequences for public safety. If immigrants refuse to come forward as victims or witnesses, it grows "more difficult for officers to solve crimes and bring suspects to justice, putting all New Jerseyans at risk." ECF No. 14-5 at 1; *see also, e.g.,* Major Cities Chiefs Ass'n, *Immigration Position* (Oct. 2011) (Ex. C) (noting "trust and cooperation with immigrant communities … are essential elements of community oriented policing"); Gaimari Decl. ¶ 5 (adding "that access to information, including information from members of the public, is fundamental to solving crime"); Manger, *supra*, at 2 (Ex. B) ("We fail if the public fears their police and will not come forward when we need them. Whether we seek to stop child predators, drug dealers, rapists or robbers—we need the full cooperation of victims and witness."); *Insecure Communities*, *supra*, at 18 ("[G]reater involvement of police in immigration enforcement has significantly heightened the fears many Latinos have of the police ... exacerbating their mistrust of law enforcement authorities … [which] has led to a reduction in public safety."). Troubling anecdotes back up these reports. *See, e.g.*, Heidi Glenn, *Fear of Deportation Spurs 4 Women to Drop Domestic Abuse Cases in Denver*, NPR (Mar. 21, 2017) (Ex. D) (describing four victims of assault in Denver refusing to proceed with pending cases for fear of being deported, which forced local prosecutors to drop the domestic abuse charges).

By drawing a clear line between state and local law enforcement officers and federal immigration authorities, New Jersey's Immigrant Trust Directive effectively

builds trust with the State's large and diverse communities, assures immigrants that they can report crimes to law enforcement officers without fear of deportation, and thus helps law enforcement officers do the hard work of enforcing criminal laws and keeping the public safe. *See, e.g.,* Gaimari Decl. ¶ 14 (explaining that "victims and witnesses [have] become more forthcoming with information, provide more accurate descriptions of suspects, and make themselves more available to participate in photo spreads, line-ups, and investigations"); Onofri Decl. ¶¶ 14-15 (observing "an increase in community cooperation with the criminal justice system" based on the Directive, in part based on the increased numbers of "U-Visa applications" submitted in Mercer County for the "undocumented immigrant victims of crimes who suffered substantial mental or physical abuse while in the United States and who are willing to assist law enforcement and government officials in the investigation of the corresponding crime"); Wong, *supra*, at 13 (Ex. A) (survey confirming that if a clear line is drawn between local law enforcement and federal immigration enforcement, "71.8 percent [of undocumented immigrants] are more likely to report a crime they witnessed to police ($p < .001$) and 70.8 percent are more likely to report being a victim of a crime to police ($p < .001$)"). It is thus no surprise that the data shows "[c]rime is statistically significantly lower" in jurisdictions that

restrict law enforcement engagement with ICE than in those where the two are entangled. Wong, *supra*, at 5 (Ex. A).[5]

An injunction would throw this regime into doubt, and would undermine the trust that law enforcement officers have worked so hard to build. After many months of publicizing the Immigrant Trust Directive in the affected communities, state and local law enforcement officers would suddenly be sharing their personal information with federal civil immigration authorities once more. Not only will that make it much harder for law enforcement officers to convince immigrant witnesses and victims to come forward during the pendency of this suit, but the effects of an injunction would potentially be irreversible, even if New Jersey ultimately prevails. *See e.g.*, Gaimari Decl. ¶ 16 ("[U]ndermining the Directive at this stage would undo several years' worth of efforts my Department invested into building and maintaining trust within the community."); Onofri Decl. ¶ 16 ("[S]triking down the Directive would have a destructive effect on the good will that my office and law enforcement agencies across the State have taken great effort to instill [and] suppress the quantity and quality of information about crimes that my office, and other local law enforcement agencies, receive from our communities."). Indeed, after ten months in which state

---

[5] Against all this, Plaintiffs have nothing to say; their discussion of the public interest simply reiterates their view that the Immigrant Trust Directive is unlawful, and says (without any evidentiary support) that "Defendants will suffer no injury" from the termination of the Directive. PI Br. at 23.

and local law enforcement officials told the public that they have nothing to fear in law enforcement interactions—unless they commit crimes in the state—the officials would be going back on their word as a result of an injunction. It would be hard, to say the least, to rebuild that trust in the future. The equities and the public interest thus militate against granting Plaintiffs' preliminary relief application.

## <u>CONCLUSION</u>

For the foregoing reasons, Plaintiffs' Motion for Preliminary Injunctive Relief should be denied.

Respectfully submitted,

GURBIR S. GREWAL
ATTORNEY GENERAL OF NEW JERSEY


By:   /s/ Daniel M. Vannella
        Daniel M. Vannella
        Assistant Attorney General (015922007)