**\*FOR PUBLICATION\***

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

| | | |
|---|---|---|
| COUNTY OF OCEAN, *et al.*, | : | |
| | : | Consolidated Civil Action |
| Plaintiffs, | : | No. 19-18083 (FLW) |
| | : | |
| v. | : | |
| | : | |
| GUBRIR S. GREWAL, in his official Capacity as Attorney General of the State of New Jersey, *et al.*, | : | **OPINION** |
| | : | |
| Defendants. | : | |
| | : | |
| ROBERT A. NOLAN, in his official capacity as Cape May County Sheriff, *et al.*, | : | |
| | : | |
| Plaintiffs, | : | |
| | : | |
| v. | : | |
| | : | |
| GUBRIR S. GREWAL, in his official Capacity as Attorney General of the State of New Jersey, *et al.*, | : | |
| | : | |
| Defendants. | : | |

**WOLFSON, Chief Judge**:

On November 29, 2018, Gubrir S. Grewal ("Attorney General Grewal"), in his capacity as Attorney General for the State of New Jersey, issued Attorney General Law Enforcement Directive No. 2018-6, known as the Immigrant Trust Directive, to limit the ability of local, county, and state law enforcement agencies from assisting

the federal government in the enforcement of federal civil immigration law.[1]   In this consolidated action against Attorney General Grewal, the State of New Jersey, Office of the Attorney General, and the Department of Law and Public Safety, Division of Criminal Justice (collectively "Defendants"), plaintiffs, the County of Ocean, the Board of Chosen Freeholders of the County of Ocean (collectively, the "Ocean County Plaintiffs"), Robert A. Nolan, in his capacity as Cape May County Sheriff, and the County of Cape May (the "Cape May County Plaintiffs") (collectively, "Plaintiffs"), seek a declaration that the Immigrant Trust Directive is preempted by the United States Constitution and violates various state constitutional and statutory provisions.   Presently before the Court are (1) Defendants' Motion to Dismiss the Complaints pursuant to Federal Rules of Civil Procedure 12(b)(1) and 12(b)(6), (ECF No. 14); and (2) a Motion for Preliminary Injunction filed by the Cape May County Plaintiffs, (ECF No. 13).   For the reasons set forth below, Defendants' Motion to Dismiss is **GRANTED** as to Plaintiffs' federal claims, and those claims are dismissed. I do not reach Defendants' Motion as to Plaintiffs' state law claims, because I decline to exercise supplemental jurisdiction over those claims.   Defendants may renew their Motion in state court should these plaintiffs choose to proceed in that forum pursuant to 28 U.S.C. § 1367(d).   Consequently, the Cape May County Plaintiffs' Motion for Preliminary Injunction is **DENIED** as moot**.**

---

[1]      Attorney General Grewal issued a revised Directive on September 27, 2019. The revised version of the Directive is substantially similar to the original Directive, except that it added certain language, discussed *infra*, which bars local governments from entering into voluntary section 287(g) agreements.   When the Court refers to the Directive, it refers to the revised Directive.

## I.     BACKGROUND AND PROCEDURAL HISTORY

### A. Federal Immigration Statutory Framework

"The Government of the United States has broad, undoubted power over the subject of immigration and the status of aliens" pursuant to its constitutional authority to "'establish a uniform Rule of Naturalization' and its inherent power as a sovereign to control and conduct relations with foreign nations." *Arizona v. United States*, 567 U.S. 387, 395 (2012) (quoting U.S. Const., Art. I, § 8, cl. 4). Pursuant to this authority, the Immigration and Nationality Act ("INA"), 8 U.S.C. § 1101, *et seq.*, "sets out the 'terms and conditions of admission to the country and the subsequent treatment of aliens lawfully in the country.'" *Kansas v. Garcia*, ___ U.S. ___, 140 S. Ct. 791, 797 (2020). The INA further governs "which aliens may be removed from the United States and the procedures for doing so." *Arizona*, 567 U.S. at 396. "Agencies in the Department of Homeland Security [("DHS")] play a major role in enforcing the country's immigration laws," including Immigration and Customs Enforcement ("ICE"). *Id.* at 397. ICE "conducts criminal investigations involving the enforcement of immigration-related statutes" and operates the Law Enforcement Support Center, which "provides immigration status information to federal, state, and local officials around the clock." *Id.* ICE is additionally responsible "for the identification, apprehension, and removal of illegal aliens from the United States." *Id.* (quotation omitted).

Notwithstanding the federal government's "'broad, undoubted power over the subject of immigration and the status of aliens,'" the "States possess primary

authority for defining and enforcing the criminal law." *City of Philadelphia v. Att'y Gen. of United States*, 916 F.3d 276, 281 (3d Cir. 2019) (quoting *Arizona*, 567 U.S. at 281). Consistent with that sovereign power, the INA contemplates states' participation in the enforcement of immigration law since "[c]onsultation between federal and state officials is an important feature of the immigration system." *Arizona*, 567 U.S. at 411–12. However, § 1357(g) does not compel state and local governments to "cooperate with the Attorney General in the identification, apprehension, detention, or removal of aliens not lawfully present in the United States." 8 U.S.C. § 1357(g)(10).[2] Rather, the statute speaks in voluntary terms. States' cooperation may include "situations where States participate in a joint task force with federal officers, provide operational support in executing a warrant, or allow federal immigration officials to gain access to detainees held in state facilities." *Arizona*, 567 U.S. at 410. Furthermore, ICE may request state and local law enforcement agencies to furnish "information about when an alien will be released

---

[2]      8 U.S.C. § 1357(g)(10) specifically provides that

> *Nothing in this subsection shall be construed to require* an agreement under this subsection in order for any officer or employee of a State or political subdivision of a State—
>> (A) to communicate with the Attorney General regarding the immigration status of an individual, including reporting knowledge that a particular alien is not lawfully present in the United States; or
>> (B) otherwise to cooperate with the Attorney General in the identification, apprehension, detention, or removal of aliens not lawfully in the United States.

(emphasis added).

from their custody." *Id.* (citing § 1357(d)); *see also* 8 C.F.R. § 287.7(a) (setting forth that DHS may issue a detainer, which acts as "a request that such agency advise the Department, prior to release of the alien, in order for the Department to arrange to assume custody, in situations when gaining immediate physical custody is either impracticable or impossible").

Moreover, pursuant to the INA, state and local law enforcement agencies may voluntarily enter into agreements, known as "287(g) Agreements,"[3] under which state or local law enforcement "officers [can] perform the duties of a federal immigration officer under the direction and supervision of the Attorney General after completing adequate immigration training." *City of South Miami v. Desantis*, 408 F. Supp. 3d 1266, 1293-94 (S.D. Fl. 2019) (citing 8 U.S.C. § 1357(g)). There is, however, no requirement that localities enter into such agreements and, critically, such agreements may only be carried out "to the extent consistent with State and local law." 8 U.S.C. § 1357(g)(1).

Finally, specifically relevant to the instant action are 8 U.S.C. § 1373 and 8 U.S.C. § 1644, which govern the sharing of information between state and local governments and the federal government in the enforcement of immigration laws. These sections provide that

> [n]otwithstanding any other provision of Federal, State or local law, a Federal, State, or local government entity or official may not prohibit, or in any way restrict, any government entity or official from sending to, or receiving

---

[3]    The term "287(g)" refers to the section of the INA that authorized these agreements. *City of El Cenizo v. Texas*, 890 F.3d 164, 178 n.5 (5th Cir. 2018) (citing *Lunn v. Commonwealth*, 78 N.E.3d 1143, 1158 (Mass. 2017))).

> from, the [federal government] information regarding the
> citizenship or immigration status, lawful or unlawful, of
> any individual.

8 U.S.C. § 1373(a); *see also* 8 U.S.C. § 1644 ("Notwithstanding any other provision of

Federal, State, or local law, no State or local government entity may be prohibited, or

in any way restricted, from sending to or receiving from the Immigration and

Naturalization Service information regarding the immigration status, lawful or

unlawful, of an alien in the United States.").   Correspondingly, the federal

government "shall respond to an inquiry by a Federal, State, or local government

agency, seeking to verify or ascertain the citizenship or immigration status of any

individual within the jurisdiction of the agency for any purpose authorized by law, by

providing the requested verification or status information."  *Id.* § 1373(c).

### B.  The Immigrant Trust Directive

On November 29, 2018, Attorney General Grewal issued Directive No. 2018-6

(the "Immigrant Trust Directive" or "Directive"), to amend certain rules governing

the interaction of state and local law enforcement and federal immigration

authorities.[4]  State of New Jersey, Attorney General Law Enforcement Directive No.

2018-6 v2.0 ("Directive No. 2018-6").   Attorney General Grewal expressed that the

Directive was necessary based on the federal government's increased reliance "on

state and local law enforcement agencies to enforce federal civil immigration," which

---

[4]      In 2007, then-Attorney General Anne Milgram issued Directive 2007-3 to
"establish the manner in which local, county, and state law enforcement agencies and
officers shall interact with federal immigration authorities."  *See* Directive No. 2018-
6, at 2 (quoting AG Directive 2007-3).

has "present[ed] significant challenges to New Jersey's law enforcement officers, who have worked hard to build trust with [the] state's large and diverse immigrant communities." *Id.* For example, the Directive observes that "[i]t is well-established . . . that individuals are less likely to report a crime if they fear that the responding officer will turn them over to immigration authorities," making "it more difficult for officers to solve crimes and bring suspects to justice."[5] *Id.* Accordingly, the Directive places certain limitations on local, state, and county law enforcement agencies with respect to enforcement of federal civil immigration law.

Relevant to this matter, the Directive limits New Jersey agencies from stopping, arresting, searching, or detaining any individual based solely on the individual's actual or suspected citizenship or any suspected violation of federal civil immigration law. *Id.* § II.A(1). Further, it prohibits state, county, and local law enforcement from "inquir[ing] about the immigration status of any individual" unless such inquiry is "a) necessary to the ongoing investigation of an indictable offense by that individual; *and* b) relevant to the offense under investigation." *Id.* § II.A(2).

---

[5] Indeed, *amicus*, the ACLU, highlights a number of studies that confirm that immigration-related fears prevent individuals from reporting crimes. For example, "[a] 2017 national survey of prosecutors revealed that the recent intensity in federal immigration enforcement . . . resulted in decreased cooperation with law enforcement by immigrant victims of crime, especially survivors of domestic violence, child abuse, and sexual assault." (ACLU Br., at 8.) Additionally, a 2013 study conducted in four countries across the United States found that 70 percent of undocumented immigrants and 44 percent of all Latinx respondents, regardless of immigration status, responded that "they would be less likely to communicate with law enforcement if they were victims of a crime out of fear that local officers would question their immigration status or the status of people they know." (*Id.* at 6–7 (footnote omitted).)

The Directive further provides that, subject to certain enumerated exceptions:

> [N]o state, county, or local law enforcement agency or official shall provide the following types of assistance to federal immigration authorities when the sole purpose of that assistance is to enforce federal civil immigration law:
>
> 1. Participating in civil immigration enforcement operations.
>
> 2. Providing any non-public personally identifying information regarding any individual.
>
> 3. Providing access to any state, county, or local law enforcement equipment, office space, database, or property not available to the general public.
>
> 4. Providing access to a detained individual for an interview, unless the detainee signs a written consent form . . .
>
> 5. Providing notice of a detained individual's upcoming release from custody, unless the detainee:
>
>     a. Is currently charged with, has ever been convicted of, has ever been adjudicated delinquent for, or has ever been found guilty by reason of insanity, a violent or serious offense as that term is defined in Appendix A;
>
>     b. In the past five years, has been convicted of an indictable crime other than a violent or serious offense, *or*
>
>     c. Is subject to a Final Order of Removal that has been signed by a federal judge and lodged with the county jail or state prison where the detainee is being held.
>
> 6. Continuing the detention of an individual past the time he or she would otherwise be eligible for release from custody based solely on a civil immigration detainer request . . . .

*Id.* § II.B.  Section III.C of the Directive sets forth the exceptions to these limitations

and provides that

> Nothing in Sections II.A and II.B shall be construed to restrict, prohibit, or in any way prevent a state, county, or local law enforcement agency or official from:
>
> 1.  Enforcing the criminal laws of this state.
>
> 2.  Complying with all applicable federal, state, and local laws.
>
> 3.  Complying with a valid judicial warrant or other court order, or responding to any request authorized by a valid judicial warrant or other court order.
>
> 4.  Participating with federal authorities in a joint law enforcement taskforce the primary purpose of which is unrelated to federal civil immigration.
>
> 5.  Requesting proof of identity from an individual during the course of any arrest or when legally justified during an investigative stop or detention.
>
> 6.  Asking an arrested individual for information necessary to complete the required fields of the LIVESCAN database (or other law enforcement fingerprinting database), including information about the arrestee's place of birth and country of citizenship.
>
> 7.  Inquiring about a person's place of birth on a correctional facility intake form and making risk-based classification assignments in such facilities.
>
> 8.  Providing federal immigration authorities with information that is publicly available or readily available to the public in the method the public can obtain it.
>
> 9.  When required by exigent circumstances, providing federal immigration authorities with aid or assistance, . . . .

> 10. Sending to, maintaining or receiving from federal immigration authorities information regarding the citizenship or immigration status, lawful or unlawful, of any individual. *See* 8 U.S.C. §§ 1373, 1644.

*Id.* § II.C.

On September 27, 2019, Attorney General Grewal issued a revised version of the Directive to address questions that had "[a]risen regarding the ability of state and local law enforcement to notify ICE about individuals who have committed violent or serious offenses." *Id.* In that connection, the Revised Directive also addresses § 287(g) agreements. Attorney General Grewal highlighted certain issues that are caused by such agreements, including that "they blur the distinction between federal civil immigration enforcement and local law enforcement."[6] *Id.* at 2. Moreover, Attorney General Grewal observed that this "ultimately creates confusion regarding the distinct roles of local law enforcement and federal agents, and it makes it less likely that victims and witnesses will cooperate with local police in criminal investigations." *Id.* Accordingly, the Directive was revised to provide that "[n]o state, county, or local law enforcement authority shall enter into, modify, renew, or extend any agreement to exercise federal immigration authority pursuant to Section 287(g)

---

[6]  *Amicus* provides data demonstrating that after counties implemented section 287(g) cooperative agreements "arrests of foreign-born residents for minor offenses, like driving without a license, increase, while arrests of foreign-born residents for more serious offenses decreased." (ACLU Br., at 17–18.) For example, after Davidson County, Tennessee, entered into a section 287(g) agreement, it saw a 15 percent increase in arrests for minor offenses and a 21 percent decrease in arrests of foreign-born residents for more severe offenses. (*Id.* at 18 (citing ACLU of Tennessee, *Consequences & Costs: Lessons Learned from Davidson County, Tennessee's Jail Model 287(g) Program*, at 6 (Dec. 2012)).)

of the [INA], and they shall not exercise any law enforcement authority pursuant to a preexisting Section 287(g) agreement." *Id.* § III.A.

### C. Procedural History

On September 18, 2019, the Ocean County Plaintiffs filed a Complaint for Declaratory Judgment against Defendants.  (Compl., ECF No. 1.)  According to the Complaint, the Ocean County Department of Corrections voluntarily exchanges inmate information, including birthplace and citizenship, with ICE, in accordance with 8 U.S.C. §§ 1373, 1644.  (*Id.* ¶¶ 13, 16.)  Through this exchange of information, ICE is able to "identify those individuals who have been charged with violating the law and are temporarily in the custody of the Ocean County Jail . . . and are not legally permitted to be in the United States," and, further, "permits ICE officers to remove those individuals who are not legally permitted to be in the United States before they are released back into the community."  (*Id.* ¶ 21–22.)  Ocean County further provided ICE access to its Offender Management System to obtain inmate biographical information.  (*Id.* ¶ 20.)  Because the Ocean County Plaintiffs seek to continue to share such information with ICE, they claim that the Immigrant Trust Directive is unconstitutional as it is preempted by federal law.  (*Id.* ¶¶ 31–40.)  Further, the Ocean County Plaintiffs assert that the Directive violates Article IV, section VII, paragraph 11 of the New Jersey State Constitution (the "Home Rule Doctrine") and exceeds the authority granted to the Attorney General.  (*Id.* ¶¶ 41–59.)

On October 15, 2019, the Cape May County Plaintiffs filed a Complaint seeking

declaratory and injunctive relief on the same grounds.  (*See Nolan v. Grewal*, No. 19-18929, ECF No. 1.)  According to their Complaint, the Cape May County Sheriff, Robert A. Nolan entered into an agreement with ICE, pursuant to section 287(g) of the INA, to provide information to permit ICE "to identify and remove aliens who are subject to removal from the United States." (*Id.* ¶ 2.)  The Cape May County Plaintiffs assert that the Immigrant Trust Directive, which prohibits municipalities in the State of New Jersey from entering into such agreements, is preempted by federal law and "frustrates and impedes the federal government's regulation and enforcement of immigration laws." (*Id.* ¶¶ 24, 41–42.)[7]  The Cape May County Plaintiffs additionally assert that the Directive was enacted in violation of the New Jersey Administrative Procedure Act and violates the State's common law doctrine of intentional interference.  (*Id.* ¶¶ 43–47.)

Because of the commonalities between the Ocean County and Cape May County Complaints, on November 7, 2019, this Court granted Defendants' motion to consolidate the matters.  (*See* ECF No. 11.)  On December 16, 2019, the Cape May County Plaintiffs filed a Motion for Preliminary Injunction, seeking to enjoin enforcement of the Directive.  (Mot. for Preliminary Injunction, ECF No. 13.)  On December 17, 2019, Defendants filed a Motion to Dismiss Plaintiffs' Complaints.

---

[7]     Count One of the Cape May Complaint claims that the Immigrant Trust Directive violates the Supremacy Clause of the United States Constitution.  The United States Supreme Court, however, has made clear that the Supremacy Clause "certainly does not create a cause of action" and, instead "creates a rule of decision . . . [and] instructs courts what to do when state and federal law clash." *Armstrong v. Exceptional Child Ctr., Inc.*, 575 U.S. 320, 324–25 (2015).

(Mot. to Dismiss, ECF No. 14.)

On January 24, 2020, the United States filed a Statement of Interest pursuant to 28 U.S.C. §§ 517, 518(b), which authorizes the United States Department of Justice "to attend to interests of the United States" by "argu[ing] any case in a court of the United States in which the United States is interested." (Statement of Interest, ECF No. 25.)  On May 19, 2020, the Court granted the American Civil Liberties of New Jersey (the "ACLU") leave to file a brief as *amicus curiae*.  (ECF No. 34.)[8]  On May 24, 2020, the ACLU filed a brief in support of Defendants' Motion to Dismiss.  (*See* ACLU Br., ECF No. 35.)

## II.   STANDARD OF REVIEW

### A. Federal Rule of Civil Procedure 12(b)(1)

Federal Rule of Civil Procedure 12(b)(1) governs a motion to dismiss for lack of subject matter jurisdiction.  "A motion to dismiss for want of standing is . . . properly brought pursuant to Rule 12(b)(1), because standing is a jurisdictional matter." *Ballentine v. United States*, 486 F.3d 806, 810 (3d Cir. 2007); *see also St. Thomas–St. John Hotel & Tourism Ass'n v. Gov't of the U.S. Virgin Islands*, 218 F.3d 232, 240 (3d Cir. 2000) ("The issue of standing is jurisdictional.").  "On a motion to dismiss for lack of standing, the plaintiff 'bears the burden of establishing the elements of standing, and each element must be supported in the same way as any other matter on which the plaintiff bears the burden of proof.'" *Ballentine*, 486 F.3d at 810 (quoting *FOCUS*

---

[8]     In the same Order, the Court denied motions for leave to appear as *amicus curiae* filed by the Immigration Reform Law Institute and National Sheriff's Association.  (*See* ECF No. 34.)

*v. Allegheny Cty. Ct. of Common Pleas*, 75 F.3d 834, 838 (3d Cir. 1996)).

### B.   Federal Rule of Civil Procedure 12(b)(6)

Under Federal Rule of Civil Procedure Rule 12(b)(6), a complaint may be dismissed for "failure to state a claim upon which relief can be granted." Fed. R. Civ. P. 12(b)(6). When reviewing a motion to dismiss on the pleadings, courts "accept all factual allegations as true, construe the complaint in the light most favorable to the plaintiff, and determine whether, under any reasonable reading of the complaint, the plaintiff may be entitled to relief." *Phillips v. Cty. of Allegheny*, 515 F.3d 224, 233 (3d Cir. 2008) (quotations omitted). Under this standard, the factual allegations set forth in a complaint "must be enough to raise a right to relief above the speculative level." *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555 (2007). Indeed, "the tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). "[A] complaint must do more than allege the plaintiff's entitlement to relief. A complaint has to 'show' such an entitlement with its facts." *Fowler v. UPMC Shadyside*, 578 F.3d 203, 211 (3d Cir. 2009).

### III.   DISCUSSION

#### A. Plaintiffs' Standing to Sue

As a threshold matter, Defendants contend that Plaintiffs, as political subdivisions of the State of New Jersey, lack standing to bring this action because these subdivisions cannot "challenge state law on constitutional grounds in federal court." (Defs.' Moving Br., at 16 (quoting *City of San Juan Capistrano v. Cal. PUC*,

937 F.3d 1278, 1280 (9th Cir. 2019)).)  Plaintiffs, however, maintain that the political subdivision doctrine does not bar suits brought by a municipality or political subdivision against their creating State under the Supremacy Clause.  (*See* Cape May Pl.'s Opp. To Def.'s Mot. to Dismiss, at 3–9; Ocean Cty. Pl.'s Opp. to Def.'s Mot. to Dismiss, at 12–17.)  I find that Plaintiffs have standing to bring suit.

Traditionally, political subdivisions have lacked judicial standing to sue their creating state.  *See Williams v. Mayor and City Council of Baltimore*, 289 U.S. 36, 40 (1933) ("A municipal corporation, created by a state for the better ordering of government, has no privileges or immunities under the Federal Constitution which it may invoke in opposition to the will of its creator."); *City of Trenton v. New Jersey*, 262 U.S. 182, 186 (1923) ("This court has never held that these subdivisions may invoke [the Contracts Clause or the Fourteenth Amendment] upon the power of the state."); *Hunter v. City of Pittsburgh*, 207 U.S. 161, 177–78 (1907).  In *Gomillion v. Lightfoot*, however, the Supreme Court more clearly defined the parameters of the State's powers over its subdivisions.  364 U.S. 339 (1960).  There, the Supreme Court considered a challenge brought by the residents of the City of Tuskegee, Alabama, to the State's definition of the City's boundaries.  *Id.* at 340.  The Court rejected Alabama's argument that the State's power over its subdivisions was unrestricted by the Constitution, and defined the contours of the "seemingly unconfined dicta of *Hunter* and kindred cases."  *Id.* at 344.  Indeed, the Court clarified that a State does not have unfettered authority over its subdivisions and that "[l]egislative control of municipalities, no less than other state power, lies within the scope of relevant

limitations imposed by the United States Constitution." *Id.* at 344–45.  Based on these principles, the Court determined that the holdings of *Hunter* and *City of Trenton* were limited to the particular prohibitions of the Constitution considered in those cases, namely the Contracts Clause and the Due Process Clause of the Fourteenth Amendment.  *Id.* at 343–44.

Since *Gomillion*, a growing number of circuits have recognized an exception to the political subdivision standing doctrine where the subdivision asserts claims based on the Supremacy Clause of the United States Constitution.  *See Tweed- New Haven Airport Auth. v. Tong*, 930 F.3d 65, 73 (2d Cir. 2019); *Brandon Sch. Dist. RE-82 v. Romer*, 161 F.3d 619, 628–30 (10th Cir. 1998); *Rogers v. Brockette*, 588 F.2d 1057 (5th Cir. 1979).  Each of these courts has taken a different approach in crafting such an exception.  For example, in *Rogers*, the Fifth Circuit reasoned that *City of Trenton* and *Hunter* when, "correctly interpreted, . . . do not deal with standing" and instead involve "substantive interpretations of the constitutional provisions involved."  588 F.2d at 1068.  The Fifth Circuit further distinguished those cases because when they were decided "'standing' generally meant something different from what it means today.  A party had standing or a 'right to sue' if it was correct in its claim on the merits that the statutory or constitutional provision in question protected its interests; standing was not seen as a preliminary or threshold question." *Id.* at 1070.

The Tenth Circuit, however, interprets *City of Trenton* as standing "only for the limited proposition that a municipality may not bring a constitutional challenge against its creating state when the constitutional provision that supplies the basis

for the complaint was written to protect individual rights, as opposed to collective or structural rights." *Branson Sch. Dist.*, 161 F.3d at 628.[9]  And, finally, the Second Circuit focused its analysis on the purpose of the Supremacy Clause and reasoned that permitting subdivisions to sue states ensures that "a state is not free to enforce within its boundaries laws preempted by federal law." *Tweed-New Haven Airport Auth.*, 930 F.3d at 73.  Indeed, the Second Circuit highlighted that since *Gomillion*, the Supreme Court "has repeatedly entertained suits against a state by a subdivision of the state, including cases under the Supremacy Clause." *Id.* (citing, for example, *Va. Office for Prot. & Advocacy v. Stewart*, 563 U.S. 247, 252–53 (2011)).[10]

Only the Ninth Circuit has held that a political subdivision lacks standing to sue its creating State pursuant to the Supremacy Clause.  *See City of San Juan Capistrano v. Cal. PUC*, 937 F.3d 1278 (9th Cir. 2019); *Burbank-Glendale-Pasadena Airport Auth. v. City of Burbank*, 136 F.3d 1360 (9th Cir. 1998).  Both *City of San Juan* and *City of Burbank*, relying on a previous Ninth Circuit decision in *South Lake*

---

[9]     While the Supremacy Clause is not a source of substantive rights, the Tenth Circuit has explained that in suits brought by political subdivisions against their states, "the source of substantive rights was a federal statute directed at protecting political subdivisions, and the Supremacy Clause was invoked merely to guarantee, as a structural matter, that federal law predominates over conflicting state law." *City of Hugo v. Nichols*, 656 F.3d 1251, 1256–57 (10th Cir. 2011).

[10]     *See also Nixon v. Missouri Mun. League*, 541 U.S. 125, 130 (2004) (considering challenge brought by municipalities under Supremacy Clause to a Missouri telecommunications statute); *Lawrence Cty. v. Lead-Deadwood Sch. Dist. No. 40-1*, 469 U.S. 256, 258–60 (1985) (considering Supremacy Clause challenge brought by a county against a state statute); *Bd. of Educ. of Central Sch. Dist. No. 1. v. Allen*, 392 U.S. 236, 240–41 (1968) (considering challenge brought by local school board against state under the Establishment Clause).

*Tahoe v. California Tahoe Regional Planning Agency*, adopted a per se rule that political subdivisions lack standing to sue their creating State for any reason. *South Lake Tahoe* involved multiple constitutional claims brought by a political subdivision against the state's regional planning agency, including a claim under the Supremacy Clause. 625 F.2d 231, 233 (1980). Without distinguishing between the multiple claims, the court dismissed all the constitutional claims, citing the familiar cases of *Williams* and *Trenton*, as well as several of its older progeny. *Id.*[11] With that sweeping language, the Ninth Circuit continues to enforce its per se rule, despite several Ninth Circuit judges expressing an interest over the years in revisiting the rationale for the rule. *See City of San Juan Capistrano*, 937 F.3d at 1282–83 (Nelson J., concurring) (suggesting it is time to reconsider the rule in light of the fact that the meaning of standing has changed and in consideration of the numerous circuits that have decided the issue the other way); *City of Burbank*, 136 F.3d at 1364–65 (Kozinski, J., concurring) (recognizing circuit split and suggesting the court reexamine its rationale for continuing with per se rule); *see also Indian Oasis-Baboquivari Unified Sch. Dist. No. 40 v. Kirk*, 91 F.3d 1240, 1247 (9th Cir. 1994) (Reinhardt, J., dissenting) (arguing that per se rule cannot be reconciled with *Seattle School District* and should be overturned).

---

[11]   The Supreme Court denied the petition for writ of certiorari in *South Lake Tahoe*. *See City of South Lake Tahoe v. Cal. Tahoe Regional Planning Agency*, 449 U.S. 1039 (1980). In denying the petition, however, Justice White, joined by Justice Marshall, issued a dissenting opinion, in which he questioned the validity of the Ninth Circuit's *per se* rule that "a political subdivision of a State may not raise constitutional objections to the validity of a state statute." *Id.* at 1042 (White J., dissenting).

The Third Circuit has not had the occasion to determine whether the political subdivision doctrine applies to claims under the Supremacy Clause.  Nevertheless, in *Amato v. Wilentz*, the Third Circuit acknowledged that while the political subdivision doctrine "remain[s] the law of the land," it further noted that "support for this rule may be waning with time."  952 F.2d 742, 754–55 (3d Cir. 1991).  In light of this observation, other courts in this Circuit have uniformly recognized the Supremacy Clause exception to the political subdivision standing doctrine, in line with the Second, Fifth, and Tenth Circuits.  *See Reach Academy for Boys & Girls, Inc. v. Delaware Dep't of Educ.*, 46 F. Supp. 3d 455, 466 (D. Del. 2014); *Pocono Mountain Charter Sch. v. Pocono Mountain School Dist.*, 908 F. Supp. 2d 597, 612 (M.D. Pa. 2012) ("In particular, courts that have allowed a municipality or municipal corporation to assert claims against its creator have generally permitted claims only for violations of the Supremacy Clause."); *Atlantic Coast Demolition & Recycling, Inc. v. Board of Chosen Freeholders of Atlantic Cty.*, 893 F. Supp. 301, 315 (D.N.J. 1995) ("[M]unicipalities may assert claims against the creating state under the Supremacy Clause, but not under other substantive constitutional guarantees.")

While Defendants urge the Court to adopt the reasoning of the Ninth Circuit on this issue, based on the overwhelming authorities to the contrary and their reasoning, the Court finds persuasive the rationale of the Second, Fifth, and Tenth Circuits.[12]  Notably, I agree with the Fifth Circuit's observation that reliance on early

---

[12]    Defendants point to the Supreme Court's decision in *Ysura v. Pocatello Educ. Ass'n*, 555 U.S. 353 (2009) as support for the principle that "States can withdraw any and all powers from their subdivisions." (Defs.' Moving Br., at 19.) None of the

Supreme Court cases, such as *Williams* and *Trenton*, to support a *per se* bar on political subdivision standing is misplaced because, at the time those cases were decided, judicial standing was a markedly different concept than what it is today. Indeed, standing was not considered as a threshold issue to bring suit, but rather, the standing inquiry focused on whether a party had a "right to sue," *i.e.*, whether "it was correct in its claim on the merits that the statutory or constitutional provision in question protected its interests." *Rogers*, 588 F.2d at 1070.   Importantly, as recognized by *Rogers*, the modern Article III standing principle stands in contrast with its earlier iteration—namely, the inquiry, now, focuses on whether there has been an injury-in-fact. *Id.*   Furthermore, it is difficult to square the Ninth Circuit's *per se* rule when the Supreme Court has repeatedly entertained claims brought by political subdivisions under the Supremacy Clause. *See supra.*   Indeed, as the Second Circuit has observed, permitting political subdivisions to bring Supremacy Clause challenges is a critical part of preserving the boundaries of our federalist system. *Tweed-New Haven Airport*, 930 F.3d at 73.   For these reasons, I find that Plaintiffs have standing to bring this matter in federal court.

### B.  Preemption and the Tenth Amendment

The Supremacy Clause of the United States Constitution provides that federal

---

parties, however, dispute this fundamental principle of state sovereignty. Nevertheless, Defendants contend that "when a State decides to grant or withdraw such powers, there is no federal law claim to be had" and, therefore, Plaintiffs have no standing to bring this action. (Defs.' Reply, at 19.) *Ysura*, however, did not address the key issue in dispute here—whether an exception to the political subdivision standing doctrine exists for claims brought under the Supremacy Clause. This is the issue the Court is called upon to address.

law "shall be the supreme law of the land; and the judges in every state shall be bound thereby, anything in the Constitution or laws of any State to the contrary notwithstanding." U.S. Const., Art. VI, cl. 2. The Clause provides a "'rule of decision' . . . that federal law is supreme in case of a conflict with state law." *Murphy v. Nat'l Collegiate Athletic Ass'n*, ___ U.S. ___, 138 S. Ct. 1461, 1479 (2018) (citation omitted) (quoting *Armstrong v. Exceptional Child Ctr., Inc.*, 575 U.S. 320, 324 (2015)). In other words, "[s]tate law that conflicts with federal law is . . . 'without effect.'" *Atkinson v. Luitpold Pharms., Inc.*, ___ F. Supp. 3d ___, 2020 WL 1330705, at *3 (E.D. Pa. Mar. 23, 2020) (quoting *Mutual Pharm. Co. v. Bartlett*, 570 U.S. 472, 475 (2013)). The Supreme Court has identified three categories of preemption: express preemption, conflict preemption, and field preemption. *Murphy*, 138 S. Ct. at 1480. Here, Plaintiffs contend that the Directive is preempted under all three categories of preemption. First, they argue that 8 U.S.C. §§ 1373(a) and 1644 expressly preempt the Directive as the statutes prohibit state and local governments from restricting the sharing of information regarding an individual's immigration status with the federal government. Plaintiffs and the United States further argue that the Directive is preempted under the principles of conflict preemption because it creates an obstacle to the federal government's ability to carry out the objectives of the INA. And, finally, only the Ocean County Plaintiffs argue that the Directive is field preempted by Congress's extensive regulation of the field of immigration. The Court will discuss each category of preemption, in turn.

### 1. *Express Preemption*

Plaintiffs and the United States contend that sections 1373(a) and 1644 expressly preempt the Directive's limitation on the sharing of certain information with ICE—specifically barring state and local law enforcement from providing ICE with "any non-public personally identifying information regarding any individual," providing access to any "state, county, or local law enforcement . . . database . . . not available to the general public," or providing "notice of a detained individual's upcoming release from custody," unless certain enumerated factors are met. *See* Directive § II.B(2), (3), (5). Section 1373(a) provides that

> Notwithstanding any other provision of Federal, State, or local law, a Federal, State, or local government entity or official may not prohibit, or in any way restrict, any government entity or official from sending to, or receiving from, [DHS] information *regarding* the citizenship or immigration status, lawful or unlawful of any individual.

8 U.S.C. § 1373(a) (emphasis added).[13]  Plaintiffs and the United States seek to apply a broad interpretation of the phrase "regarding the citizenship or immigration status . . . of any individual" that would include non-public personal identifying information and the release date of detained individuals.  Defendants, however, maintain that the phrase should be narrowly interpreted to apply only to information pertaining to an

---

[13]     Similarly, section 1644 provides that "[n]otwithstanding any other provision of Federal, State, or local law, no State or local government entity may be prohibited, or in any way restricted, from sending to or receiving from [DHS] information regarding the immigration status, lawful or unlawful, of an alien in the United States."  The parties' arguments relating to sections 1644 and 1373 are identical, and therefore, the Court will address these sections in tandem.

individual's immigration status, *i.e.*, an individual's legal and citizenship status.  In that connection, Defendants argue that the Directive does not conflict with sections 1373(a) and 1644 as it permits State and local law enforcement to comply with requests for such information.  *See* Directive § II.C(10).  Moreover, Defendants contend that the broad interpretation of sections 1373(a) and 1644 runs afoul of the Tenth Amendment.[14]

### i.    *Sections 1373(a) and 1644 as Preemption Provisions*

Before reaching the parties' arguments as to the reach of sections 1373(a) and 1644, the Court questions whether these sections are valid preemption provisions.  It is well-established that express preemption "arises when there is an explicit statutory command that state law be displaced."  *St. Thomas—St. John Hotel & Tourism Ass'n, Inc. v. Gov't of the U.S. Virgin Islands*, 218 F.3d 232, 238 (3d Cir. 2000) (quoting *Morales v. Trans World Airlines, Inc.*, 504 U.S. 374 (1992)).  Indeed, in *Murphy*, the

---

[14]    Defendants frame their Tenth Amendment argument as one of constitutional avoidance.  It is well established that the canon of constitutional avoidance is employed "when 'a serious doubt' is raised about the constitutionality of an act of Congress," which requires courts to "first ascertain whether a construction of the statute is fairly possible by which the question may be avoided."  *Jennings v. Rodriguez*, 138 S. Ct. 830, 842 (2018) (quoting *Crowell v. Benson*, 285 U.S. 22, 62 (1932)).  However, the canon is only applicable "when, after the application of ordinary textual analysis, the statute is found to be susceptible of more than one construction."  *Id.* (quoting *Clark v. Martinez*, 543 U.S. 371, 385 (2005)).  Importantly, "[i]n the absence of more than one plausible construction, the canon simply 'has no application.'"  *Id.* (quoting *United States v. Oakland Cannabis Buyers' Cooperative*, 532 U.S. 483, 494 (2001)).  As discussed *infra*, the Court finds that Plaintiffs' broad interpretation of section 1373(a), which Defendants contend violates the Tenth Amendment, is simply not supported by the plain meaning of the statute.  Because section 1373(a) is not susceptible to more than one construction, there are no grounds on which to invoke the canon of constitutional avoidance, and I need not discuss it.

Supreme Court clarified that all three types of preemption "work in the same way:
Congress enacts a law that imposes restrictions or confers rights on private actors; a
state law confers rights or imposes restrictions that conflict with the federal law; and
therefore the federal law takes precedence and the state law is preempted."  138 S.
Ct. at 1480.  In *Murphy*, the Court determined that the Professional and Amateur
Sports Protection Act ("PASPA"), which barred states from adopting legal sports
gambling schemes, did not constitute a preemption provision because there was "no
way in which this provision can be understood as a regulation of private actors."  *Id.*
at 1481.  Sections 1373(a) and 1644 are similar to PAPSA, in that, these sections
regulate only state and local governments and do not, in any way, regulate private
actors.  Indeed, in the wake of *Murphy*, several district courts have found that §§
1373(a) and 1644 are not preemption provisions because "[b]y their plain terms, the
provisions affect state and local government entities and officials; they do not
regulate private actors as *Murphy* requires for preemption."  *Colorado v. U.S. Dep't
of Justice*, ___ F. Supp. 3d ___, 2020 WL 1955474, at *18 (D. Colo. Apr. 23, 2020); *see
also Oregon v. Trump*, 406 F. Supp. 3d 940, 972 (D. Or. 2019) (observing that "by their
terms, Sections 1373 and 1644 affect only state and local government 'entit[ies]' and
'official[s]'"); *City & Cty. of San Francisco v. Sessions*, 349 F. Supp. 3d 924, 950 (N.D.
Cal. 2018) ("Section 1373 . . . does not regulate private actors or provide private actors
with any additional rights in the INA's statutory scheme.   DOJ's preemption
argument fails on this distinction.").

　　　Recognizing such a distinction, the United States instead argues that *Murphy*

does not apply because "the information covered by 8 U.S.C. § 1373(a) and 1644 belongs to private actors, and the statute ensures that the federal government can access this information." (USA Statement of Interest, at 21.)  The Government draws this nuanced distinction without citing to any authority and I do not find it persuasive.  While sections 1373(a) and 1644 require the sharing of information regarding private individuals, these provisions plainly regulate the sharing of such information by state and local government officials, and significantly, they do not regulate private actors in any way.  *See Colorado*, 2020 WL 1955474, at *18.  Nothing in *Murphy* or other Supreme Court precedents instruct courts to look beyond what actors a statute seeks to regulate in determining whether that statute has a preemptive effect; what the United States advocates for is inconsistent with, and too attenuated from, the principles set forth by *Murphy*.  In this Court's view, under the guidance of *Murphy*, sections 1373(a) and 1644 do not constitute preemption provisions.  Indeed, this conclusion, alone, is a death knell to Plaintiffs' and United States' arguments on preemption.  However, because of the important constitutional interests at hand, I nevertheless will consider the parties' arguments as to whether the Directive conflicts with the relevant portions of the INA.

### ii.    *Express Preemption and Sections 1373(a) and 1644*

The key to determining whether the information sharing provisions of the Directive are expressly preempted by sections 1373(a) and 1644 is understanding the scope of the phrase "information regarding the citizenship or immigration status" of any individual.  *See* § 1373(a).  In that connection, Plaintiffs and the United States

maintain that the section should be read broadly based on the inclusion of the term "regarding," which they argue indicates an intent to broaden the scope of the provision. (*See* Cape May Opp. Br., at 13; USA Statement, at 14.)[15] Defendants, on the other hand, maintain that the construction of sections 1373(a) and 1644 advanced by Plaintiffs is overly broad and would "sweep[] in anything that relates to federal removability or detention decisions, that reaches far beyond the plain text" of the statute. (Defs.' Moving Br., at 22–24.) I agree.

In construing a statute, courts must begin with the text itself, "and proceed from the understanding that 'unless otherwise defined, statutory terms are generally interpreted in accordance with their ordinary meaning.'" *Sebelius v. Cloer*, 569 U.S. 369, 376 (2013) (quoting *BP America Prod. Co. v. Burton*, 549 U.S. 84, 91 (2006)). The first step of that analysis "is to determine whether the language at issue has a plain and unambiguous meaning with regard to the particular dispute in the case."

---

[15]     The United States contends that the broadening effect of "regarding" is further evident when section 1373(a) is contrasted with section 1373(c), which imposes an obligation on the federal government to respond to any inquiry from state or local government agencies "seeking to verify or ascertain the citizenship or immigration status of any individual within the jurisdiction of the agency for any purpose authorized by law." (*See* USA Statement, at 14.) Because section 1373(c) omits the word "regarding," the United States reasons that section 1373(a) should be read more broadly to include other information, such as an alien's personal identifying information and the release date of a detained individual. *See id.* The Court disagrees. First, as set forth *infra*, a plain reading of section 1373(a) reveals that the section contemplates only the sharing of information reflecting an individual's legal status in the United States. Moreover, "the fact that subpart (c) only concerns itself with immigration status suggests, given § 1373's focus on reciprocal communication between states and the federal government, that immigration status is the extent of subpart (a)'s reach as well." *United States v. California*, 921 F.3d 865, 892 (9th Cir. 2019) (*California II*).

*Barnhart v. Sigmon Coal Co.*, 534 U.S. 438, 450 (2002) (quoting *Robinson v. Shell Oil Co.*, 519 U.S. 337, 340 (1997)). If "the meaning of the statutory text is plain, [the court's] inquiry is at an end." *Roth v. Norfalco, LLC*, 651 F.3d 367, 379 (3d Cir. 2011). If, however, the text is "reasonably susceptible of different interpretations," it may be ambiguous. *Edwards v. A.H. Cornell & Son, Inc.*, 610 F.3d 217, 222 (3d Cir. 2010) (quoting *Dobrek v. Phelan*, 419 F.3d 259, 264 (3d Cir. 2005)). Only when the statute is ambiguous may courts look to other portions of the statute for guidance, because "[s]tatutory interpretation focuses on 'the language itself, the specific context in which that language is used, and the broader context of the statute as a whole.'" *AT&T Mobility, LLC v. Concepcion*, 563 U.S. 333, 354 (2002) (quoting *Robinson v. Shell Oil Co.*, 519 U.S. 337, 341 (1997)). And, only when a statute is ambiguous and after consideration of the statutory scheme, may courts consider the legislative history or other extrinsic material – and then, only if it "shed[s] a reliable light on the enacting Legislature's understanding of otherwise ambiguous terms." *Exxon Mobil Corp. v. Allapattah Servs.*, 545 U.S. 546, 568 (2005).

Recently, and relevant here, a number of courts have considered the language of sections 1373(a) and 1644, and their scope relating to the type of information to be shared by state and local agencies. In *United States v. California (California II)*, the Ninth Circuit considered the validity of the California Values Act, which "limits law enforcement's 'discretion to cooperate with immigration authorities.'" 921 F.3d 865, 876 (9th Cir. 2019). Substantially similar to the Directive, the California Values Act, *inter alia*, prohibits state and local law enforcement agencies from sharing with

federal immigration authorities personal identifying information, such as "the individual's home address or work address," or "information regarding a person's release date." *Id.* (quoting Cal. Gov't Code § 7285.6(a)(1)).[16] There, the United States, likewise, argued that section 1373 directly conflicts with the restrictions of the information set forth in the California Values Act, and insisted that Congress's inclusion of the term "regarding" in section 1373 indicated that the statute should be broadly construed to preempt the California law. *Id.* at 892–93. The Ninth Circuit acknowledged that, generally speaking, phrases like "regarding" have "a broadening effect, ensuring that the scope of a provision covers not only its subject but also matters relating to that subject." *Id.* at 891–92 (quoting *Lamar, Archer & Cofrin, LLP v. Appling*, 138 S. Ct. 1752, 1759–60 (2018)). However, it observed that "if the term 'regarding' were 'taken to extend to the furthest stretch of its indeterminacy, then for all practical purposes preemption would never run its course, for [r]eally, universally, relations stop nowhere.'" *Id.* (alteration in original) (quoting *N.Y. State Conference of Blue Cross & Blue Shield Plans v. Travelers Ins. Co.*, 514 U.S. 645, 655 (1995)). Rejecting the United States' strained reading of § 1373, the *California II* court held that the phrase "is naturally understood as a reference to a person's legal classification under federal law." *Id.* at 891. While the Ninth Circuit did not reach

---

[16]    In *California II*, the United States also challenged two other California statutes—the Immigrant Worker Protection Act, which sets forth certain protections for immigrant employees, and AB 103, which permits the California Attorney General to inspect detention facilities which house or detain noncitizens for the purposes of civil immigration proceedings. 921 F.3d at 875–76. These are not relevant to the case at hand.

the issue of whether section 1373 violates the anticommandeering doctrine of the Tenth Amendment, *id*. at 893 n.19, the district court found its constitutionality "highly suspect" because it "dictate[s] what states may and may not do." *United States v. California* (*California I*), 314 F. Supp. 3d 1077, 1101 (E.D. Cal. 2018), *aff'd in part & rev'd and remanded in part*, 921 F.3d 865. Dissatisfied by the Ninth Circuit's decision, the United States pressed on and sought writ of certiorari from the Supreme Court. Just last month, in June 2020, the Court denied that petition. *See United States v. California*, ___ S. Ct. ___, 2020 WL 3146844 (2020).

Courts have also considered the scope of section 1373 in the context of the Edward Byrne Memorial Justice Assistance Grant ("Byrne Grant") Program, through which the federal government provides financial assistance to states and localities for criminal justice purposes. *See City & Cty. of San Francisco v. Sessions*, 349 F. Supp. 3d 924, 967 (N.D. Cal. 2018); *City of Philadelphia v. Sessions*, 309 F. Supp. 3d 289, 295 (E.D. Pa. 2018), *aff'd in part and vacated in part on other grounds*, 916 F.3d 276 (3d Cir. 2019). As conditions of receiving a Byrne Grant, a locality must provide ICE with advance notice of release dates of inmates and certify its compliance with section 1373. *City of Philadelphia*, 309 F. Supp. 3d at 295. A number of states and municipalities across the country have challenged these conditions on the grounds that they violate the Tenth Amendment. For example, in *City of Philadelphia*, the United States argued that section 1373 requires localities to "provide advance notice of release from City custody" based on a broad interpretation of the phrase "information regarding . . . citizenship or immigration status." *Id*. at 331. The court

rejected this position, finding that the United States' reading of the statute was "simply impossible to square with the statutory text." *Id.* Indeed, the court held that the plain meaning of the phrase "citizenship or immigration status," means "an individual's category of presence in the United States—e.g., undocumented, refugee, lawful permanent resident, U.S. citizen—and whether or not an individual is a U.S. citizen, and if not, of what country." *Id.*[17]

In reaching this conclusion, the *City of Philadelphia* court relied on the Northern District of California's decision in *Steinle v. City & Cty. of San Francisco*, 230 F. Supp. 3d 994 (N.D. Cal. 2017). *Steinle* involved a suit brought pursuant to 42 U.S.C. § 1983 by the surviving relatives of a woman who was killed by an undocumented man after he had been released from the custody of the San Francisco's Sheriff's Department. *Id.* at 1004. Prior to his release, ICE had sent a detainer request to the Sheriff's Department seeking advance notice of his release date so ICE could take custody of him. *Id.* The Sheriff's Department did not respond to the detainer because of city policy. *Id.* Plaintiffs alleged that the City was per se negligent, partly because it failed to comply with § 1373, which provision, plaintiffs asserted, required the city to provide advance notice of an inmate's release to ICE. *Id.* at 1005. The *Steinle* court dismissed this claim, as it found that "[n]othing in 8

---

[17]      In affirming the district court's decision in *City of Philadelphia*, the Third Circuit determined that section 1373 was not an "applicable law" for which the United States could require compliance in order for a city or municipality to receive JAG funds. *See City of Philadelphia v. Att'y Gen. of the United States*, 916 F.3d 276, 288–91 (3d Cir. 2019). As a result, the Third Circuit did not reach the scope and facial validity of section 1373. *See id.*

U.S.C. § 1373(a) addresses information concerning an inmate's release date." *Id.* at 1015. The same conclusion was reached by the court in *City & Cty. of San Francisco,* 349 F. Supp. 3d at 967-98 ("I agree with the other district courts that found Section 1373 would support only a narrow interpretation that extends to 'information strictly pertaining to immigration status (i.e. what one's immigration status is).'").

Here, I am persuaded by these decisions that a plain reading of sections 1373(a) and 1644 reflects that the only information that state and local governments are required to share is the legal status—*i.e.*, citizenship or immigration status—of an individual. While, generally, a term like "regarding" has a broadening effect, to read it as broadly as advanced by Plaintiffs and the United States would impermissibly expand the scope of these statutes to sweep in *any* information, including personal identifying data, concerning an alien in the United States. Indeed, neither Plaintiffs nor the United States suggest any limit to their interpretation of the statute, an unreasonable result, that the statute based on its plain wording, cannot contemplate. *Accord N.Y. State Conference of Blue Cross & Blue Shield Plans*, 514 U.S. at 655. There is simply nothing in the statute to suggest that the inclusion of the word "regarding" requires States and local governments to share personal identifying information and dates of release from detention, as such information does not directly relate to, or regard, an individual's immigration status.[18] *See City of Philadelphia*, 309 F. Supp. 3d at 331; *see also Steinle*, 230 F. Supp. 3d at 1015.

---

[18]     Indeed, as discussed *infra*, if the Court were to read sections 1373(a) and 1644 as broadly as requested by Plaintiffs and the United States, the sections would violate the Tenth Amendment.

Rather, plainly, the phrase "regarding the citizenship or immigration, lawful or unlawful of any individual" means just that—information relating to the immigration status of an alien, including his/her citizenship.

Because the Court finds that sections 1373(a) and 1644 apply only to information specifically regarding an individual's immigration or citizenship status, *i.e.*, whether the individual is a U.S. citizen, green card holder, or holds some other legal or unlawful status in the United States, they do not expressly preempt the Directive.[19] Indeed, the Directive specifically permits compliance with those sections

---

[19]    The Cape May County Plaintiffs urge the Court to consider the legislative history of sections 1373(a) and 1644, which they contend supports a broad reading of sections 1373 and 1644. For example, the Cape May Plaintiffs cherry pick language from the Senate Report and argue that "Congress'[s] stated purpose in enacting § 1644 was 'to give State and local officials the authority to communicate with [DHS] regarding the presence, whereabouts, or activities of illegal aliens.'" (Cape May Opp., at 14 (quoting *City of New York v. United States*, 179 F.3d 29, 32–33 (2d Cir. 1999)).) In light of the Court's finding that the statutes are unambiguous, such an argument cannot be squared with well-settled principle of statutory construction. Indeed,

> [t]reating legislative reports as binding law [] undermines our constitutional structure of separated powers, because legislative reports do not come with the traditional and constitutionally-mandated political safeguards of legislation. As noted above, legislative reports are not acts of law satisfying the precise requirements of Article I, which were devised by the Framers to ensure separation of powers and a careful legislative process. By contrast, legislative reports may in some cases be written by an individual legislator, congressional staffers, or even lobbyists. Giving binding effect to passages in legislative reports may thus give binding legal effect to the unchecked will of a lone person, and that is not what our Constitution envisions.

*Nw. Envtl. Def. Ctr. v. Bonneville Power Admin.*, 477 F.3d 668, 684-85 (9th Cir. 2007) (footnotes omitted). In that regard, "Congress's 'authoritative statement is the statutory text, not the legislative history.'" *Chamber of Commerce of U.S. v. Whiting*, 563 U.S. 582, 599 (2011) (quoting *Exxon Mobil Corp. v. Allapattah Servs., Inc.*, 545 U.S. 546, 568 (2005)). Because the plain language of sections 1373(a) and 1644 is

by allowing state, local, and county law enforcement agencies to "send[] to . . . federal immigration authorities information regarding the citizenship or immigration status, lawful or unlawful of any individual."  Directive No. 2018-6 § II.C(10).

### iii.    Anticommandeering and the Tenth Amendment

If the Court were to accept the broad reading of sections 1373(a) and 1644 advanced by Plaintiffs and the United States, and find preemption, these particular provisions would run afoul of the anticommandeering doctrine of the Tenth Amendment.  The Tenth Amendment provides that "[t]he powers not delegated to the United States by the Constitution, nor prohibited by it to the States, are reserved to the States respectively, or to the people."  U.S. Const., amend. X.  From the Tenth Amendment, emerges the anticommandeering doctrine, which provides that "the Federal Government may not compel the States to implement, by legislation or executive action, federal regulatory programs."  *Printz v. United States*, 521 U.S. 898, 925 (1997); *see also Murphy*, 138 S. Ct. at 1475–76.  As the Supreme Court explained in *Murphy*, "[t]he anticommandeering doctrine may sound arcane, but it is simply the expression of a fundamental structural decision incorporated into the Constitution, *i.e.*, the decision to withhold from Congress the power to issue orders directly to the States."  138 S. Ct. at 1475.  In other words, "any law that commandeers the legislative processes [and agencies] of the States by directly compelling them to enact and enforce a federal regulatory program is beyond the inherent limitations on

---

clear, there is no basis to go behind the language and delve into the legislative history. *See Steinle*, 230 F. Supp. 3d at 1014 (declining to consider legislative history of section 1373 because of the clarity of the statutory text).

federal power within our dual system" of government. *Galarza v. Szalczyk*, 745 F.3d 634, 643 (3d Cir. 2014). This doctrine serves several key purposes, including promoting "[a] healthy balance of power between the States and the Federal Government [which reduces] the risk of tyranny and abuse from either front," "promot[ing] political accountability" by making it clear to "[v]oters who like or dislike the effects of the regulation . . . who to credit or blame," and "prevent[ing] Congress from shifting the costs of regulation to the States." *Murphy,* 138 S. Ct. at 1477.

The Supreme Court first addressed the anticommandeering doctrine in *New York v. United States*, 505 U.S. 144 (1992), in which it considered the validity of a federal law regulating the disposal of radioactive waste by the states. Specifically, at issue was a provision that required states to, under certain conditions, either adopt the regulations for disposal advanced by Congress or "take title" to radioactive waste. *Id.* at 152–54. The Supreme Court held that the "take title" provision violated the Tenth Amendment based on the principle that "Congress may not simply 'comandee[r] the legislative processes of the States by directly compelling them to enact and enforce a federal regulatory program.'" *Id.* at 161 (quoting *Hodel v. Va Surface Mining & Reclamation Ass'n, Inc.*, 452 U.S. 264, 288 (1981)). Several years later in *Printz*, the Court again applied the anticommandeering doctrine in considering the validity of a provision of the Brady Handgun Violence Protection Act, which temporarily required the chief law enforcement officer of localities to conduct background checks and other tasks when an individual purchased a handgun until a national system for such checks became operative. 521 U.S. at 902–03. The *Printz*

Court held that the provision unconstitutionally conscripted the states and their officers into the service of the federal government.  *Id.* at 935.  In that regard, the Court explained:

> The Federal Government may neither issue directives requiring the States to address particular problems, nor command the States' officers, or those of their political subdivisions, to administer or enforce a federal regulatory program.  It matters not whether policymaking is involved, and no case-by-case weighing of the burdens or benefits is necessary; such commands are fundamentally incompatible with our constitutional system of dual sovereignty.

*Id.*

Most recently, the Supreme Court invoked the anticommandeering doctrine in *Murphy* to invalidate a provision in PASPA that prohibited states from authorizing sports gambling.  The provision specifically made it "unlawful" for a State or any of its subdivisions "'to sponsor, operate, advertise, promote, license, or authorize by law or compact . . . a lottery, sweepstakes, or other betting, gambling, wagering scheme based . . . on' competitive sporting events." *Id.* at 1465. (quoting 28 U.S.C. § 3702(2)). The Supreme Court found the provision to be a "direct affront to state sovereignty," because the "provision unequivocally dictates what a state legislature may and may not do." *Id.* at 1478.  Critically, the Supreme Court found that any attempt to draw a distinction between federal laws that command state action and those that prohibit state action to be "empty," and the Court made plain that "[t]he basic principle—that Congress cannot issue direct orders to state legislatures—applies in either event."

*Id.* at 1478.[20]

In light of these principles, it is clear that if sections 1373(a) and 1644 were broadly construed to cover all types of information possibly related to the enforcement of immigration law, including personal identifying data and dates of release of inmates, they would violate the Tenth Amendment under the anticommandeering doctrine.[21]  Indeed, much like the provision at issue in *Murphy*, a broad reading of

---

[20]   Further undercutting the position of Plaintiffs and the United States, since *Murphy* a majority of courts that have considered facial challenges to section 1373 have found it to be unconstitutional under the Tenth Amendment.  *See City of Chicago v. Sessions*, 321 F. Supp. 3d 855, 872 (N.D. Ill. 2018) (finding that "Section 1373 impermissibly directs the functioning of local government in contravention of Tenth Amendment principles" and "is thus unconstitutional on its face"); *see also Oregon v. Trump*, 406 F. Supp. 3d 940, 971 (D. Or. 2019) ("Here, the Court agrees with Plaintiffs, as well as every other court to have considered the issue after *Murphy*, that sections 1373 and 1644 violate the Tenth Amendment."); *City and Cty. of San Francisco*, 349 F. Supp. 3d 924 (N.D. Cal. 2018) (finding section 1373 unconstitutional under the Tenth Amendment).  *But see State of N.Y. v. Dep't of Justice*, 951 F.3d 84, 116 (2d Cir. 2020) (holding that "the district court erred in holding 8 U.S.C. § 1373 unconstitutional because the statute does not violate the anticommandeering principle of the Tenth Amendment as applied here to a federal funding requirement").  The question of section 1373's validity, however, is not before the Court in this matter as none of the parties argue that section 1373 is facially unconstitutional.

[21]   The United States argues that there is an "information sharing exception" to the anticommandeering doctrine.  In support of that argument, the United States relies on the Supreme Court's decision in *Reno v. Condon* and dicta from *Printz*.  Neither case supports the application of such an exception, if one exists, to this case.  First, *Reno v. Condon* involved a challenge brought by South Carolina to the Driver's Privacy Protection Act of 1994, which required disclosure to the federal government of personal identifying information kept in the records of state motor vehicle departments.  528 U.S. 141, 143 (2000).  The Supreme Court found the statute valid under the Tenth Amendment as it "does not require the States in their sovereign capacity to regulate their own citizens, . . . [but] regulates the States as the owners of databases." *Id.* at 151.  Unlike the law at issue in *Reno*, however, sections 1373(a) and 1644 do not simply require disclosure of information, but instead "directly tell[s] states and state actors that they must refrain from enacting certain state laws." *City of Philadelphia*, 309 F. Supp. 3d at 330.  Moreover, the dicta from *Printz*, in which

36

sections 1373(a) and 1644 would "unequivocally dictate[] what a state legislature may and may not do." *Murphy*, 138 S. Ct. at 1478.  Under the proposed interpretation, states would have no ability to make the "legitimate choice" to decline to participate in the enforcement of federal immigration law because they would be unable to regulate the type of information that state and local agencies share with federal immigration authorities.  By prohibiting state and local governments from restricting the types of information shared with the federal government, sections 1373(a) and 1644 would seemingly require state and local law enforcement agencies to share *any* information about an alien, giving the state no choice but to participate in the enforcement of federal immigration law.  This would clearly act to "compel state and local agencies to expend funds and resources to effectuate a federal regulatory scheme," because states could not decline to share certain information relating to an alien with the federal government.  *See Galarza*, 745 F.3d at 644.

Put simply, even if the Directive "obstructs federal immigration enforcement, the United States' position that such obstruction is unlawful runs directly afoul of the Tenth Amendment and the anticommandeering rule." *California II*, 921 F.3d at 888. As it stands, the Directive permits full compliance with sections 1373(a) and 1644 as

---

the Supreme Court stated that statutes "which require only the provision of information to the Federal Government[] do not involve . . . the forced participation of the States' executive in the actual administration of a federal program," was language in the opinion where the Court recounted, and then rejected, the Government's specific arguments made in the context of that case. *See Printz*, 521 U.S. at 917–18.  Contrary to the United States' position, the *Printz* Court did not carve out any exception to the anticommandeering doctrine. *See City of Philadelphia*, 309 F. Supp. 3d at 330.  In short, the United States' argument is specious.

it explicitly allows state, local, and county officials to share information regarding an individual's immigration status.  *See* Directive § II.C(10).  New Jersey has elected to bar its localities from sharing other information that is plainly not covered by those provisions.  This is, therefore, a legitimate exercise of the State's police power and regulation of its law enforcement resources.  Accordingly, Plaintiffs' express preemption claims are rejected.

## 2. Conflict Preemption

Next, Plaintiffs and the United States argue that the Directive is conflict preempted by certain provisions of the INA.  The Supreme Court has explained that state laws may be preempted where they conflict with federal law, including "cases where 'compliance with both federal and state regulations is a physical impossibility,' and those instances where the challenged state law 'stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress.'"  *Arizona*, 567 U.S. at 399–400 (citations omitted) (first quoting *Florida Lime & Avocado Growers, Inc. v. Paul*, 373 U.S. 132, 142–43 (1963); and then *Hines v. Davidowitz*, 312 U.S. 52, 67 (1941)); *see also Farnia v. Nokia, Inc.*, 625 F.3d 97, 122 (3d Cir. 2010) ("Conflict preemption exists (1) 'where it is impossible for a private party to comply with both state and federal requirements' or (2) 'where state law stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress.'" (quoting *Fellner v. Tri-Union Seafoods, LLC*, 539 F.3d 237, 251 (3d Cir. 2008))).  There is, however, "a strong presumption against preemption when Congress legislates in an area traditionally occupied by the States."  *United*

*States v. California*, 314 F. Supp. 3d 1077, 1088 (N.D. Cal. 2018) (*California I*).  In that connection, "courts should assume that 'the historic police powers of the States' are not superseded 'unless that was the clear and manifest purpose of Congress.'" *Arizona*, 567 U.S. at 400 (quoting *Rice v. Santa Fe Elevator Corp.*, 331 U.S. 218, 230 (1947)).

### i.   *Information Sharing Provisions*

First, Plaintiffs and the United States argue that the prohibitions on information sharing in Section II.B of the Directive are conflict preempted by the INA because the Directive frustrates the INA's "comprehensive framework for the detention and removal of criminal and other aliens . . . through numerous interlocking and mutually reinforcing provisions that depend on and call for information-sharing by state and local officials."  (USA Statement of Interest, at 9.)  More specifically, the United States explains that under 8 U.S.C. § 1231(a)(1), DHS is required to remove an alien who has been ordered removed within 90 days of the order of removal, and for aliens who are "detained or confined," the 90-day period begins to run on the "date the alien is released from detention or confinement."  *See* 8 U.S.C. §§ 1231(a)(1)(A), (a)(1)(B)(ii); *O'Farril v. Certoff*, No. 07-1221, 2007 WL 1217355, at *1 (D.N.J. Apr. 24, 2007).  Based on that tight timeframe, the United States contends that the objectives of these provisions cannot be achieved if DHS is not provided "information about aliens in state and local custody and about their release." (USA Statement of Interest, at 10.) Further, Plaintiffs and the United States contend that the Directive's prohibition on sharing an inmate's release date with DHS "undercuts

DHS's ability to execute administrative warrants pursuant to 8 U.S.C. § 1226(a) [and] fulfill the mandatory detention obligation set forth in 8 U.S.C. § 1226(c)." (USA Statement of Interest, at 11.)

Sections 1231 and 1226, which Plaintiffs and the United States contend preempt the Directive, govern the federal government's removal and detention of aliens. Section 1231(a)(1) provides, in pertinent part,

> **(A) In general**
>
> Except as otherwise provided in this section, when an alien is ordered removed, the Attorney General shall remove the alien from the United States within a period of 90 days (in this section referred to as the "removal period").
>
> **(B) Beginning of Period**
>
> The removal period begins on the latest of the following:
>
> . . .
>
> (iii) If the alien is detained or confined (except under an immigration process), the date the alien is released from detention or confinement.

Sections 1226(a) and 1226(c) govern the arrest and detention of aliens. Section 1226(a) provides that following arrest on a warrant issued by the Attorney General, an alien may be "detained pending a decision on whether the alien is removed from the United States." Section 1226(c) requires the Attorney General to detain certain aliens upon their release from custody.

Here, Plaintiffs and the United States' conflict preemption arguments ignore that sections 1226 and 1231(a)(1) impose obligations solely on the federal

government.[22]  This is important, because under those statutes, state and local law enforcement agencies have no duty to assist the federal government with carrying out those obligations, except as required under sections 1373(a) and 1644, *i.e.*, information sharing.  Indeed, nothing in sections 1231(a)(1) and 1226 suggests "that Congress impliedly mandated that state and local governments would act in accordance with these statutes." *California II*, 921 F.3d at 887.  As the Ninth Circuit has observed, "[e]ven if Congress had every expectation that [the States] would [comply with these sections], and opted not to codify its belief based on the presumption that states would conduct their law enforcement activities in concert with federal immigration efforts, it is a state's historic police power—not preemption—that we must assume, unless clearly superseded by federal statute." *Id.* Simply put, "[f]ederal law does not suggest the intent—let alone a 'clear and manifest' one—to prevent states from regulating *whether* their localities cooperate in immigration enforcement." *City of El Cenizo v. Texas*, 890 F.3d 164, 178 (5th Cir. 2018).

Pointedly, the Seventh Circuit found a similar argument raised by Plaintiffs, here, to be a "red herring."  In *City of Chicago v. Sessions*, the Seventh Circuit considered whether certain conditions imposed upon recipients of a Byrne Grant violated the Constitution, including the "'notice' condition mandating advance notice

---

[22]      In that connection, the Court need not address the United States' arguments with respect to sections 1226 and 1231 and the anticommandeering doctrine because those sections do not apply to state actors and place obligations solely on the federal government.

to federal authorities of the release date of persons in state or local custody who are believed to be aliens." 888 F.3d 272, 277 (7th Cir.), *vacated in part*, 2018 WL 4268817 (2018) (en banc). The City of Chicago challenged those conditions as they were inconsistent with the provisions of the City's Welcoming City Ordinance, which, among other things, restricts the type of information shared with federal immigration authorities. *Id.* at 278–81. As related to the City's challenge, the United States framed the central issue as "whether localities can be allowed to thwart federal law enforcement" by declining to provide advance notice of inmate release dates. *Id.* at 282. While *City of Chicago* did not present a question of conflict preemption, the court saliently observed that a state's decision not to participate in the enforcement of federal civil immigration law did not prevent the federal government from fulfilling the objectives of Congress:

> [N]othing in this case involves any affirmative *interference* with federal law enforcement at all, nor is there any interference whatsoever with federal immigration authorities. The only conduct at issue . . . is the refusal of the local law enforcement to aid in civil immigration enforcement through informing the federal authorities when persons are in their custody . . . . Some localities might choose to cooperate with federal immigration efforts, and others may see such cooperation as impeding the community relationships necessary to identify and solve crimes. The choice as to how to devote law enforcement resources—including whether or not to use such resources to aid in federal immigration efforts—would traditionally be one left to state and local authorities.

*Id.* Similarly, here, New Jersey has made the decision not to cooperate with the enforcement of federal immigration law in an effort to strengthen the relationship between its communities and police, and shore up more effective enforcement of state

criminal law.  That choice is a clear exercise of the State's police power to regulate the conduct of its own law enforcement agencies.  *See California I*, 314 F. Supp. 3d at 1105.  There is no indication that Congress, in enacting the INA, sought to usurp that power.  *Id.*  As such, the federal government cannot strong arm the State into doing its own bidding.

Moreover, it is significant that the Directive does not interfere with the federal government's inherent power to regulate immigration.  As Defendants and *Amici* note, the Directive "does not give anyone the right to remain in the country, or set limits on whom federal authorities can detain or when or where they can detain them."  (Defs.' Moving Br., at 27–28; ACLU Br., at 29.)  While immigration is undoubtedly the subject of the Directive, that alone does not render the Directive a regulation on immigration that would stand in the way of the federal government carrying out its objectives under the INA.  As the Supreme Court has explained, not "every state enactment which in any way deals with aliens is a regulation of immigration and thus per se pre-empted by [the federal government's] constitutional power." *DeCanas v. Bica*, 424 U.S. 351, 355 (1976), *superseded by statute*, Immigration Reform & Control Act of 1986, 100 Stat. 3359, *as recognized in*, *Kansas v. Garcia*, 40 S. Ct. 791, 797 (2020).  Indeed, "the fact that aliens are the subject of a state statute does not render it a regulation of immigration, which is essentially a determination of who should or should not be admitted into the country, and the conditions under which a legal entrant may remain." *Id.*  The Directive, in merely defining the contours of New Jersey's and its localities' involvement in the

43

enforcement of federal civil immigration law, does not encroach onto the regulation of immigration. *See City of Chicago*, 888 F.3d at 281 (finding that Chicago's "Welcoming City Ordinance" did not interfere "in any way with the federal government's lawful pursuit of its civil immigration activities" and did not "immunize anyone to the reach of the federal government").

In sum, the Court finds that the information sharing provisions of the Directive are not conflict preempted by the INA, because they do not impose a true "obstacle" on the federal government's execution of federal civil immigration law. While it may very well be easier for federal law enforcement to effect removals if it has states' assistance, that does not change the clear command of sections 1226 and 1231(a)(1), which place the burden of complying with the INA on the federal government, not state and local authorities. Merely because a state law "inconveniences" the federal government does not render it preempted—"the repugnance must be 'so direct and positive that the two acts cannot be reconciled or consistently stand together.'" *California I*, 314 F. Supp. 3d at 1088 (quoting *Goldstein v. California*, 412 U.S. 546, 554–55 (1973)). Rather, the fact that the federal government may, without the cooperation of local law enforcement agencies, expend extra efforts and resources to apprehend aliens who are subject to removal, does not create the kind of "direct" obstacle necessary to trigger conflict preemption. *See id.* at 1104 (finding that California's limitations on sharing information with the federal government was not an obstacle to the federal government's enforcement of civil immigration law).

### ii.     *Prohibition on § 287(g) Agreements*

Further, the Cape May County Plaintiffs argue that the Directive's prohibition of § 287(g) agreements between the United States and New Jersey state, county, and local law enforcement agencies "frustrates" the federal government's enforcement of immigration law.  (Cape May Opp. Br., at 16.)  In response, Defendants correctly respond that the INA has no preemptory effect on this provision of the Directive because the 287(g) agreement program "is entirely voluntary," and "the INA is clear that law enforcement agencies can only carry out 287(g) agreements 'to the extent consistent with State and local law."

Section 1357(g) governs so-called 287(g) agreements, and permits state and local governments to enter into a written agreement with the Attorney General of the United States

> pursuant to which an officer or employee of the State or subdivision, who is determined by the Attorney General to be qualified to perform a function of an immigration officer in relation to the investigation, apprehension, or detention of aliens in the United States (including the transportation of such aliens across State lines to detention centers), *may* carry out such function at the expense of the State or political subdivision and to the extent consistent with State and local law.

8 U.S.C. § 1357(g)(1) (emphasis added).  287(g) agreements are entirely voluntary, and there is no requirement that any State or local government enter into any such agreement.  *See* § 1357(g)(9) ("Nothing in this subsection shall be construed to require any State or political subdivision of a State to enter into an agreement with the Attorney General under this subsection."); *see also City of El Cenizo*, 890 F.3d at 178

("Section 1357 does not require cooperation at all.").

The Cape May County Plaintiffs' argument in this regard requires little analysis. The INA itself contemplates that State law governs whether a subdivision can cooperate with enforcement of federal immigration law through a 287(g) agreement. That comports with the State of New Jersey's well-established police power to regulate and control its own law enforcement agencies. The Court must presume that such police powers are not superseded "unless that was the clear and manifest purpose of Congress." *Arizona*, 567 U.S. at 400. Here, "[f]ederal law does not suggest the intent—let alone a 'clear and manifest' one—to prevent states from regulating *whether* their localities cooperate in immigration enforcement." *City of El Cenizo*, 890 F.3d at 178. Indeed, that participation by local enforcement agencies is solely within the control of their creating state. While 287(g) agreements may facilitate the federal government's enforcement of immigration laws, and perhaps, the federal government may in fact benefit from such assistance from local authorities, the Directive's prohibition on New Jersey localities from entering into such agreements does not create any obstacle to that enforcement.[23]

---

[23]    The Cape May County Plaintiffs rely on the Second Circuit's observation in *City of New York v. United States*, that voluntary cooperation between the federal and state governments is critical for the effectuation of the system of dual sovereignties. 179 F.3d 29, 35 (2d Cir. 1999) (holding that "states do not retain under the Tenth Amendment an untrammeled right to forbid all voluntary cooperation with state or local officials with particular federal programs"). There is no doubt that the Second Circuit's observation is sound, but where federal law plainly allows states to decide whether to participate in a federal program, that same set of laws cannot have a preemptive effect on a state's regulation prohibiting such participation. Furthermore, here, the state has not intruded upon the cooperation required under sections 1373(a) and 1644.

### 3.  Field Preemption

Finally, only the Ocean County Plaintiffs, in a conclusory fashion, argue that the Directive is preempted by the INA under the principles of field preemption.  In that connection, the Ocean County Plaintiffs contend that "a fair reading of the legislative history of these statutes reflects Congressional intent to regulate immigration information exchanges between federal and state and local governments."  (Ocean Cty. Br., at 23.)  Defendants, however, maintain that "both the INA and the Tenth Amendment ensure that *States* have the right to decide the extent of their participation in federal immigration enforcement."  (Defs.' Reply Br., at 11 n.4 (emphasis in original).)

The doctrine of field preemption provides that "the States are precluded from regulating conduct in a field that Congress, acting within its proper authority, has determined must be regulated by its exclusive governance." *Arizona*, 567 U.S. at 399. Put differently, state law on an issue may be preempted where a federal regulatory scheme is "so pervasive . . . that Congress left no room for the States to supplement it." *Id.* (quoting *Rice v. Santa Fe Elevator Corp.*, 331 U.S. 218, 230 (1947)).  The Directive is clearly not field preempted by the INA.  While Congress has the exclusive province to regulate federal civil immigration law, the INA itself contemplates that States shall have the ability to determine the extent to which they participate in the enforcement of such laws.  *See City of El Cenizo*, 890 F.3d at 179; *see also* 8 U.S.C. § 1357(g) (permitting states and localities to enter into agreements with the Attorney General "to perform a function of an immigration officer . . . to the extent consistent

with State and local law"); 8 U.S.C. § 1252c(a) ("Notwithstanding any other provision of law, to the extent permitted by relevant State and local law, State and local law enforcement officials are authorized to arrest and detain an individual who—(1) is an alien illegally present in the United States; and (2) has previously been convicted of a felony in the United States and deported or left the United States after such conviction . . . ."); *Galarza*, 745 F.3d at 640 ("[N]o provisions of the [INA] authorize federal officials to command local or state officials to detain suspected aliens subject to removal."). Nothing in the Directive seeks to obstruct any immigration objectives of the federal government. Thus, I find that the Directive is not field preempted by the INA, because it is clear that Congress contemplated that it was the province of the States to determine the extent to which its law enforcement agencies would participate in the enforcement of federal civil immigration law.

### C. Intergovernmental Immunity

Finally, the United States argues, in two paragraphs, that the Directive is unlawful because it violates the principles of intergovernmental immunity embodied by the Supremacy Clause. Specifically, the United States contends that the Directive's restrictions on sharing information with the federal government unlawfully discriminates against it and interferes with its ability to regulate immigration. Defendants, however, argue that, as a procedural matter, the Court need not consider this argument because the United States is not a party and Plaintiffs did not raise this theory in their Complaints. Even so, Defendants maintain that the Directive does not offend the principles of intergovernmental immunity

48

because its provisions do not regulate the United States.

First, as to the procedural defect, Defendants' argument has facial appeal. It is true that the United States is not a named party, but rather, under statutory authority of 28 U.S.C. §§ 517, 518(b), the United States filed a brief here to protect its interests in this important immigration dispute between the State of New Jersey and its municipalities. As such, because it is not a party, the United States may be logically precluded from raising claims or issues not presented by the Complaint or by the named parties in this case. However, it is also unclear whether §§ 517 or 518(b) confers upon the Department of Justice the authority to interject unraised issues in a matter where the federal government, by comparison, acts as an *amicus*.[24] While I question the propriety of the United States raising the issue of intergovernmental immunity for the first time in its brief, I will, for the sake of completeness, address it.

The principles of intergovernmental immunity were first set forth by the Supreme Court in *McCulloch v. Maryland*, in which it held that "the States have no power, by taxation or otherwise, to retard, impede, burden, or in any manner control, the operations of the constitutional laws enacted by Congress to carry into execution the powers vested in the national government." *Treasurer of N.J. v. U.S. Dep't of Treasury*, 684 F.3d 382, 409–10 (3d Cir. 2012) (quoting *McCulloch v. Maryland*, 17 U.S. (4 Wheat.) 316, 322 (1819)). Put differently, under the principles of

---

[24]  It is well settled that a party acting as *amicus* cannot raise new issues that have not been presented by the parties. *See N.J. Retail Merchants Ass'n v. Sidamon-Eristoff*, 669 F.3d 374, 382 n.2 (3d Cir. 2012).

intergovernmental immunity, "[a] state regulation is invalid only if it regulates the United States directly or discriminates against the Federal Government or those with whom it deals." *North Dakota v. United States*, 495 U.S. 423, 435 (1990). In *California I*, the court considered whether California's restriction on sharing the release dates of inmates violated the principles of intergovernmental immunity. *See* 314 F. Supp. 3d at 1110. The *California I* court questioned whether intergovernmental immunity would apply in a situation where a state regulates "the activities of its own law enforcement." *Id.* Moreover, the court found that the United States had failed to show that California's restrictions on sharing information with federal immigration authorities "uniquely burdened" the federal government or that similarly situated authorities, such as civil law enforcement agencies, were treated more favorably than the federal government. *Id.* at 1111. The Ninth Circuit affirmed the district court's rejection of the United States' argument as "[a] finding that [California's information sharing restrictions] violate[] the doctrine of intergovernmental immunity would imply that California *cannot* choose to discriminate against federal immigration authorities by refusing to assist their enforcement efforts—a result that would be inconsistent with the Tenth Amendment and the anticommandeering rule." *California II*, 921 F.3d at 891.

Here, there is no question that the Directive does not regulate the United States directly; it regulates only the conduct of state and local law enforcement agencies in the State of New Jersey. In that regard, the United States has failed to demonstrate how the Directive "discriminates" against it, except to generally allege

that the Directive interferes with Congress's inherent authority to regulate federal immigration law, a position that this Court has already rejected. Nor has the United States suggested that New Jersey permits its law enforcement to share nonpublic personal identifying information or inmate's release dates with any similarly situated law enforcement agency. Accordingly, because the Directive neither regulates the United States nor discriminates against it, the Directive is not invalid under the principles of intergovernmental immunity.

### D. State Law Claims

Plaintiffs also bring several claims for relief under the New Jersey Constitution and other New Jersey state laws. Specifically, the Ocean County Plaintiffs claim that the Directive violates the Home Rule Doctrine of the New Jersey Constitution and that Attorney General Grewal lacks authority to issue the Directive. The Cape May County Plaintiffs bring a state law claim of tortious interference and allege that the Directive was issued in violation of the New Jersey Administrative Procedure Act.

Because I have dismissed Plaintiffs' federal claims, the only basis for this Court's jurisdiction over the state law claims is supplemental jurisdiction pursuant to 28 U.S.C. § 1367. "Supplemental jurisdiction allows federal courts to hear and decide state-law claims along with federal-law claims where they 'are so related to claims in the action within such original jurisdiction that they form part of the same case or controversy.'" *Wis. Dep't of Corrections v. Schact*, 524 U.S. 381, 387 (1998) (quoting § 1367(a)). Where a district court has original jurisdiction pursuant to 28

U.S.C. § 1331 over federal claims and supplemental jurisdiction over state law claims pursuant to 28 U.S.C. § 1367(a), the district court has discretion to decline to exercise supplemental jurisdiction if it has dismissed all claims over which it has original jurisdiction.  28 U.S.C. § 1367(c)(3); *Growth Horizons, Inc. v. Delaware Cty., Pa.*, 983 F.2d 1277, 1284–85 (3d Cir. 1993).  In exercising this discretion, "the district court should take into account generally accepted principles of 'judicial economy, convenience, and fairness to the litigations."  *Growth Horizons*, 983 F.2d at 1284 (quoting *United Mine Workers v. Gibbs*, 383 U.S. 715, 726 (1966)).

Here, the Court declines to exercise such discretion because the New Jersey state courts should have the opportunity to determine whether the provisions of the Directive comport with the New Jersey Constitution and other related state law. Accordingly, Plaintiffs' state law claims are dismissed without prejudice, and they may re-file in state court pursuant to 28 U.S.C. § 1367(d) within 30 days from the date of the accompanying Order.

## IV.   CONCLUSION

For the reasons set forth below, Defendants' Motion to Dismiss is **GRANTED** as to Plaintiffs' federal claims, and those claims are dismissed with prejudice. Because the Court declines to exercise supplemental jurisdiction over Plaintiffs' state law claims, the Court does not reach Defendants' Motion to dismiss those claims. Rather, Defendants may renew their Motion in that regard in state court should Plaintiffs choose to proceed in that forum pursuant to 28 U.S.C. § 1367(d).  Lastly, the Cape May County Plaintiffs' Motion for Preliminary Injunction is **DENIED** as

moot.

Dated:        July 29, 2020                    /s/ Freda L. Wolfson
                                               Freda L. Wolfson
                                               U.S. Chief District Judge